WILLIAM NEVES AND JAMES C. NEVES, APPELLANTS, *v.* WILLIAM F. SCOTT AND RICHARD ROWELL.

The rule formerly, with regard to the enforcement of marriage articles which created executory trusts, was this; ,namely, that chancery would interfere only in favor of one of the parties to the instrument or the issue, or one claiming through them; and not in favor of remote heirs or strangers, though included within the scope of the provisions of the articles. They were regarded as volunteers.

But this rule has in modern times been much relaxed, and may now be stated thus: that if, from the circumstances under which the marriage articles were entered into by the parties, or as collected from the face of the instrument itself, it appears to have been intended that the collateral relatives, in a given event, should take the estate, and a proper limitation to that effect is contained in them, a court of equity will enforce the trust for their benefit.

The following articles show an intention by the parties to include the collateral relatives: —

"Articles or agreement made and entered into this 17th day of February, in the year 1810, between John Neves and Catharine Jewell, widow and relict of the late

Neves et al. *v.* Scott et al.

Thomas Jewell, (deceased,) all of the State and county aforesaid, are as follows, viz. : —
" Whereas a marriage is shortly to be had and 'solemnized between the said John Neves and the said Catharine Jewell, widow, as aforesaid, are as follows, to wit : — that all property, both real and personal, which is now, or may hereafter become, the right of the said John and Catharine, shall remain in common between them, the said husband and wife, during their natural lives, and should 'the said Catharine become the longest liver, the property to continue hers so long as she shall live, and at her death the estate to be divided between the heirs of her, said Catharine, and the heirs of the said John, share and share alike, agreeable to the distribution laws of this State made and provided. And, on the other hand, should the said John become the longest liver, the property to remain in the manner and form as above."
Moreover, these articles are an executed trust, not contemplating any future act, but intended as a final and complete settlement.
Property acquired by either party after the marriage must follow the same direction which is given by the settlement to property held before the marriage, if there is a clause to that effect in the same.

THIS was an appeal from the Circuit Court of the United States for the District of Georgia. It was the case of a bill filed upon the equity side of that court by William Neves, a citizen of Alabama, and James C. Neves, a citizen of Mississippi, against Scott and Rowell, citizens of Georgia. .

The facts were these.

In the year 1810, John Neves and Catharine Jewell, widow of Thomas Jewell, deceased, in contemplation of a marriage shortly to take place between them, executed the following articles of agreement.

" *Georgia, Baldwin County.*

" Articles of agreement made and entered into this 17th day of February, in the year 1810, between John Neves and Catharine Jewell, widow and relict of the late Thomas Jewell, (deceased,) all of the State and county aforesaid, are as follows, viz. : —

" Whereas a marriage is shortly to be had and solemnized . between the said John Neves and the said Catharine Jewell, widow, as aforesaid, are as follows, to wit : — that all the property, both real and personal, which is now or may hereafter become the right of the said John and Catharine, shall remain in common between them, the said husband and wife, during their natural lives, and should the said Catharine become the longest liver, the property to continue hers so long as she shall live, and at her death the estate to be divided between the heirs of the said Catharine and the heirs of the said John, share and share alike, agreeable to the distribution laws of this State made and provided. And, on the other hand, should the said John become the longest liver, the property to remain in the manner and form as above.

" In witness whereof, the said John and Catharine hath here-
17 *

unto set their hands and affixed their seals the day and year above written.

> " John Neves,                    [L. S.]
>                   her
>       Catharine  ⋈  Jewell,      [L. S.]
>                  mark.
>
> " Test:   Cornelius Murphy,
>           Jesse Ward."

The marriage took place soon afterwards.

In October, 1828, John Neves made a will, and shortly thereafter died. By this will he directed commissioners to be appointed who should divide his whole estate, both real and personal, equally between his wife, Catharine Neves, and George W. Rowell, to whom he devised his half; and appointed Captain Richard Rowell and Myles Greene his executors.

In a codicil, the testator directed that certain real and personal property should be sold for the payment of his debts.

Greene declined to act as executor, but Richard Rowell took out letters testamentary, and was proceeding to sell the property named in the will, when Catharine filed a bill against him in the Superior Court of Baldwin County, and obtained an injunction upon him to stay further proceedings. She produced the agreement above mentioned, alleged that, under it, she was entitled to the whole of the real and personal estate during her natural life, and offered to give security for the payment of all his debts. The result of this suit was, that Rowell was allowed the expenses which he had incurred whilst acting as executor, and Catharine gave bond, with security, for the payment of the debts of the estate.

In 1835, Catharine intermarried with William F. Scott, and died in September, 1844.

In February, 1845, William Neves, and James C. Neves, the brother and nephew of John Neves, filed their bill in the Circuit Court. The bill stated the above facts; alleged that, after the marriage between Catharine and Scott, all the property remained in their joint possession until her death; that Scott was insolvent, and had used a large amount of the money and proceeds of the estate in payment of his debts; stated, as an estoppel, the former judgment of a court in Georgia sustaining Catharine's right upon the ground of the validity of the marriage settlement; charged waste, and prayed for a discovery, and decree that they, the complainants, might be put into possession of one half of all the property which was owned by John Neves and Catharine Neves. They also made Richard Rowell a defendant.

*Neves et al. v. Scott et al.*

In April, 1845, the defendants both demurred to the bill.

In April, 1846, the Circuit Court, then holden by John C. Nicoll, the District Judge, sustained the demurrer, from which decree the complainants appealed to this court.

It was argued by *Mr. Walker* and *Mr. Johnson* (Attorney-General), for the appellants, and a printed argument was filed by *Mr. Stephens*, for the appellees.

The counsel for the appellants divided the argument into two branches.

I. That the articles amounted to a marriage settlement; that they went into effect as such; and no further act or conveyance was stipulated, or intended to be executed by the parties. In support of this construction the authorities relied on were Atherly, 121–123, 151; 2 Vernon, 702–705; 3 Ves. jr. 387, 397; 12 Ves. 218; 9 Simons, 195; 3 Mylne & Keen, 197; 7 Pet. 393.

This is a complete settlement.

1st. Because (if the reasoning of our opponents be adopted) it will frustrate a specific provision of the instrument in favor of the complainants, and thus defeat the intention of the parties.

2d. It is under seal, which is usual in deeds, but not in mere articles.

3d. It is attested by several witnesses.

4th. It is not mere minutes, or heads agreed upon by the parties for a future settlement, but a complete settlement of itself.

5th. It neither directs nor contemplates any future act or further instrument to complete the settlement, but purports to be itself a final settlement.

6th. The words used are such as operate of themselves to transfer the property. It is not what the settlements shall be, but what by the instrument they are. From and after the marriage, the property, by virtue of the instrument itself, is to "remain in common between them, the said husband and wife," during their natural lives. This went into effect at once, as a legal estate upon the marriage: so, also, on the death of the husband before the wife. "The property to continue hers so long as she shall live." This was a life estate, vesting in her by law on the death of the husband; so, also, the subsequent grant to the heirs. They are all estates vested in law by the instrument itself, and no future act or conveyance was ever made or contemplated.

If the case were doubtful, it may be interpreted by the acts

and declarations of the parties.    These acts and declarations show that the instrument was understood by all parties to be a complete settlement.    Barstow *v.* Kilvington, 5 Ves. 592 and note to ed. of 1844, p. 602; Pulteney *v.* Darlington, 1 Bro. Ch. 223, 236, 239; Randal *v.* Randal, 2 P. Wms. 464, 467; 2 Sugden on Vendors, (9th ed.) 170.

(It was then argued that the acts of the parties in the prior suit, mentioned in the statement of this case, confirmed the validity of the instrument as a marriage settlement.)

II. But admitting, for the sake of argument, that the instrument must be regarded as mere articles, they are valid, and operate in favor of the complainants in this case, for the following reasons : —

1st. Because, even if voluntary and executory, they are under seal, and not a *nudum pactum;* they would operate as a bond, or covenant, on which damages could be recovered at law ; and therefore are founded on a consideration which entitles them to be enforced in equity.

2d. If not available as a sealed instrument, to entitle complainants to a decree for the land, they do authorize us to ask for a decree for the personal property, including the slaves.

3d. Because near relatives, such as brothers and nephews, being the heirs of one of the parties, are not volunteers.

4th. Because the complainants claim as heirs through one in whose favor the contract was made, and are also specially provided for in the contract, and come within the influence of the marriage consideration, as the nearest relations and heirs of the husband, one of the parties to the contract.

5th. Because the marriage contract, besides the consideration of marriage, was founded on an additional valuable consideration, namely, the grant of the husband's property to the wife, in common with the husband, during their joint lives, — the whole to her as survivor during her life, and the joint property on her death to the heirs of both ; which benefit the wife received in full, constituting a purchase by the husband of the interest in exchange of the wife's property for himself and his heirs.

Independent of the marriage, the wife has received, under the contract, a full and valuable consideration in an amount of property of the husband greater than her own ; and it is admitted, even by the District Judge, in his adverse decision as filed, that the contract was founded " on the consideration of marriage and other considerations."

And a very slight consideration, in addition to the marriage, and even a meritorious consideration (not valuable), will enable

volunteers to recover. Some of these cases of slight considerations occur in executory agreements; some in covenants not contained in a settlement; others in additional covenants contained in a settlement, but sustained as covenants by a decree of specific performance, and not as deeds or a settlement. Atherly, 145, and 8 Watts & Sergeant, 413; Ib., 1 Hare & Wallace, 67; 1 Lev. 150; Hardres, 398; 2 Younge & Collyer's Ch. 451.

6th. If, as in this case, the articles have been executed, in part, at the instance of Mr. and Mrs. Scott, securing them, by decree against the legatee, an estate in the property which they could only have taken under the articles, it establishes the articles, and, in the language of Atherly, "If a bill for a specific performance is brought by the issue, the court will direct the articles to be executed *in toto*, and consequently the settlement will contain limitations in favor of the volunteers," &c. The rule is the same as to the wife, the very party to the contract. The author adds in a note, "It may be proper to state, that where the court executes articles at all, it always executes them *in toto*, and not partially." Atherly, 125.

Here, at the instance of the husband, Scott, and wife, the will, which would have carried the property to Rowell but for the articles, is set aside, and carried into execution in favor of Scott and wife. The court thus having established the articles, and executed them in part, they must be executed *in toto*. And if one court executes the articles in part, another court, carrying out the intention of the first, will, at the proper time, direct the execution *in toto*.

The verdict of the jury (which, under the laws of Georgia, became a judgment in the case of Catharine Neves *v.* Richard Rowell) was in these words:—

"*Bill in Equity and for Injunction.*

"We, the jury, find for the complainant a life estate in the property, agreeably to the provisions of the marriage contract, leaving all other persons to contest their rights at her death."

Here the marriage contract was executed in favor of the wife, and to the extent of the provision in the contract for her, namely, "a life estate in the property, agreeably to the provisions of the marriage contract." All other parties were left "to contest their rights at her death." But how contest them? Why, surely, "agreeably to the provisions of the marriage contract"; the court simply leaving open, necessarily, who then would be the heirs of Catharine Neves and John Neves. If this were not so, Catharine Neves must have taken more

than a life estate, at least as regards what was her own property before the marriage. Now, surely, nothing could be more inequitable and unjust than that the wife should take at her own instance a life estate in the whole property (including that of her husband), and excluding during her life all his heirs or legatees; and then, when the wife, after the death of her husband (Neves), having enjoyed and had decreed to her a life estate in her husband's property as well as her own, her heirs now claim both properties. But under the decree the wife took but "a life estate," even in what had been her own property before the marriage; the wife then being limited to a life estate, by the decree affirming the marriage contract, how can her husband, Scott, claim any portion of this property as her heir, when she had but a life estate, terminating with her life, and not an inheritance? The limitation, then, of a life estate to the wife under the decree is conclusive against any one claiming merely as her heir.

Again, Scott, the second husband, is a stranger to the marriage contract; he is a pure volunteer, and he can claim as heir nothing of the property of Neves, independent of the contract; and if he claim under it as heir, it must be in accordance with its provisions, jointly with the heirs of John Neves.

The estate granted to John Neves's heirs is not an ulterior limitation, but a fee simple absolute, after the expiration of a life estate.

If it be an actual settlement, no question exists but that it will prevail even in favor of volunteers. Atherly, 144.

As to the first and second points, — Fonblanque's Eq., p. 343, note A, book 1, chap. 5, sec. 1; Turner *v.* Benoin, Hardres, 200; Clough *v.* Lambert, 10 Simons, 174, 177 – 179; 1 Eq. Cases Abr. 84; Wiseman *v.* Roper, 1 Reps. in Chan. 158; Randal *v.* Randal, 2 P. Wms. 464, 466, 467; Beard *v.* Nutal, 1 Vernon, 427; Boughton *v.* Boughton, 1 Atkyns, 625; Lechmere *v.* Earl of Carlisle, 3 P. Wms. 211, 221; Bunn *v.* Winthrop, 1 Johns. Ch. 329, 336; Atherly, 81.

As to the third and fourth points of brief, — Lechmere *v.* Earl of Carlisle, 3 P. Wms. 211; Vernon *v.* Vernon, 2 ib. 593, 599; S. C., 1 Bro. P. C. 267, 268; Wiseman *v.* Roper, 1 Reps. in Chan. 158; 1 Wilson, 124, 305; Chaplin *v.* Homer, 1 P. Wms. 484; Jenkyns *v.* Keymish, Hardres, 395, 397; 1 Chan. Reps. 275; 1 Cases in Chan. 103; 1 Lev. 150, 237; Lancy *v.* Fairechild, 2 Vernon, 101; Knight *v.* Atkyns, Ib. 20; Warwick *v.* Gerrard, Ib. 8; Bailey *v.* Wright, 18 Ves. 49; Watt *v.* Watt, 3 Ves. 244; Symons *v.* Rutter, 2 Vernon, 227; 1 Eq. Cases Abr. 17; Davenport *v.* Bishop, 2 Younge & Coll-

yer, Ch. 451; Bleeker v. Bingham, 3 Paige, Ch. 246; Allen v. Rumph, 2 Hill, Ch. 3; Talbot v. Archer, 3 Hen. & Munf. 399, 410, 411; Watts v. Bullas, 1 P. Wms. 60; Atherly, note 1, p. 127, n. 1, p. 397, 398, 401, note 1; Colman v. Sarel, 3 Bro. C. C. 12; 2 Kent's Com. (3d ed.) 172; Pulvertoft v. Pulvertoft, 18 Ves. 84, 92; 2 Sugden on Vendors, 162 – 166.

As to fifth point of brief, — Lingen v. Souray, 1 Eq. Cas. Abr. 175; Osgood v. Osgood, 2 P. Wms. 245, 254; Stephens v. Trueman, 1 Ves. sen. 73; Atherly, 145 – 148 (and cases there cited), note 2, p. 125, note 1, p. 147, 160 – 164, 172, 177, 178, 186, note 1, 301, note 1, 336, 347, note 1, 358, note 2; 2 Kent's Com. (3d ed.) 173, 174; 2 Sugden on Vendors (9th ed.) 166 – 168; 1 Hare & Wallace's Amer. Leading Cases, 67; Duffy v. Insurance Company, 8 Watts & Serg. 413, 432 – 435.

The argument on the part of the defendants also considered the two points separately, viz.: —

1. That this was not a marriage settlement.

2. That the complainants were mere volunteers.

1. To show that this was not a final settlement, but only an executory contract, the authority relied on was 2 Story's Eq. Jur. (3d ed.), § 383.

The court below, in its decision upon the demurrers, used this language in reference to this paper: — "That the instrument under which the plaintiffs ask the interposition of the court constitutes an executory, and not an executed agreement, can scarcely admit of a doubt. It is in terms an executory, and not an executed agreement, and of the most informal character. It transfers no property, passes no estate, declares no trustees, and contains no word of direct and immediate conveyance, and nothing to indicate that it was a complete and actual settlement. It relates, not merely to property in possession, but to that which might be acquired in future, and the greater part of that which is the subject of the plaintiff's bill was subsequently acquired either by purchase or descent, and could not be the subject of an executed contract. The title of the plaintiff, therefore, rests entirely in covenant."

2. We will suppose the point to be settled, that this instrument is mere articles, and not a legal, executed settlement; and that brings us to the main proposition, namely, that equity will not interfere, in any manner, to aid a volunteer claiming under marriage articles. Atherly on Marriage Settlements (27 Law Library edition), marginal pages 125, 127 – 151; 1 Story's

Eq. Jur. (3d ed.) § 433; 2 Story's Eq. Jur. §§ 793 *a*, 973, 986, 987, and note; Ellison *v.* Ellison, 6 Ves. jr. 662; 2 Kent's Com. (3d ed.) 172, 173; Colman *v.* Sarel, 1 Ves. jr. 50.

It is useless to multiply authorities to sustain a position, which, as a general principle, is undeniable. We are aware that a class of cases may be found, in which it is said that equity will enforce articles, at the instance of a person " who claims through one who was himself within the influence of the marriage consideration, though he himself should not be within it." But when these cases are examined, it will be found that the person claiming in the cases adverted to really claimed as the heir of the party within the range of the marriage articles, and representing him, and as taking the interest which the ancestor had himself derived by and through the deed or articles; and not to enforce any claim which had vested in the collateral heir as such. For example, where by the articles the fee is vested in the husband, his collateral heir might bring his bill to enforce this claim of the husband, which he, the collateral heir, had inherited.

But the claim of plaintiffs is urged by them upon a very different view. They are not setting up these articles to enforce any claim of John Neves, the husband; but, on the contrary, they expressly declare that his claim was limited to a life interest, and could not endure beyond that. They deny his right to make a will thereof, which could affect their " vested rights " under the " settlement." They claim, therefore, in their own right, not as coming in, in the estate of the first taker, " but as taking originally, in the capacity of purchasers." They do not say, we are the heirs of the husband, John Neves, and as such heirs representing the interest or estate secured to him by these articles, but we claim by and through the instrument, as representing ourselves, and as answering to the description of the persons who were to take one half upon the death of the survivor of John and Catharine Neves. And we say that, despite John Neves's will, even if it has been fairly made, we are entitled to this half, because the articles limited his interest to his life, and then we, and not he, had the right to the remainder.

Such is the language which complainants use, and if they have stated their own case correctly they are mere volunteers, not within the consideration of the marriage settlement, who are seeking for themselves, and in their own right, to enforce marriage articles, — an aid which, we respectfully say, has never been awarded. It has been correctly said by the court below, in commenting upon the cases cited there in behalf of

plaintiffs, that this view is sustained by the very authorities which were invoked to invalidate it. The court below has classified the various authorities adduced by the plaintiff's counsel under three heads, and, as it would be a vain task for us to attempt to make more lucid such classification, we will adopt it as a part of our argument.

1. The first class refer to the established principle in equity, that what ought to be done shall be considered as done, — a rule so powerful as to alter the nature of things, and make money land, and land money. " Thus, money articled to be laid out in land shall be taken as land, and descend to the heir." Lechmere *v.* Lord Carlisle, 3 P. Wms. 215 ; Babington *v.* Greenwood, 1 P. Wms. 532.

" If, therefore, it be agreed by marriage articles that money shall be laid out in lands, to be settled, for example, to the husband for life, remainder to the sons of the marriage in tail, remainder to the daughters, remainder to the heirs of the husband for ever, (which, under the operation of the rule in Shelley's case, gives the whole fee to the husband,) equity will, at the instance of the proper party, one who claims through the husband, and not as purchaser, in his own right, consider this money as land, and treat the investment as actually made in the lifetime of the husband, and regard him as seized in his lifetime of an estate in fee devolving by descent upon such person as claims through him as heir." The court below says, that to this class may be referred Kettleby *v.* Atwood, 2 Vern. 298, 471 ; Lancey *v.* Fairchild, Ib. 101 ; Knight *v.* Atkyns, Ib. 20 ; Edwards *v.* Countess of Warwick, 2 P. Wms. 171 ; 4 Bro. P. C. 494 ; 3 Atkyns, 447 ; Lechmere *v.* Earl of Carlisle, 3 P. Wms. 211 ; Cases Temp. Talbot, 80 ; Atherly, 126, 127, 398 ; 2 Powell on Contracts, 104.

It must be very manifest, that the case at bar has no manner of applicability to the principle involved in these cases.

2. The second class of cases referred to by the court below apply, " where the settlement is made through the instrumentality of a party whose concurrence is necessary to the validity of the settlement, and who insists upon a provision in favor of a person ; for instance, a younger child, a collateral relation of the husband, who would not come within the consideration of marriage. Such person is held not to be a mere volunteer, but as falling within the range of the consideration of the agreement." Such are the cases of Osgood *v.* Strode, 2 P. Wms. 245 ; Goring *v.* Nash, 3 Atk. 186.; to which may be added Roe e. d. Hamerton *v.* Whitton, 2 Wils. 356. But these very cases themselves establish (as is remarked by the court below)

that the marriage consideration alone will not support the limitation to a brother or sister, and are therefore adverse to the claim of the present plaintiffs, inasmuch as there is no pretence to say, that they come within the range of the exception carved out in the decisions last referred to.

3. The third class of cases referred to by the court below, in sustaining the demurrers, are based upon the ground upon which Lord King principally rested his decree in the case of Vernon *v.* Vernon, 2 P. Wms. 594; (see also 3 Atk. 190; Stephens *v.* Trueman, 1 Ves. jr. 74; Wilhams *v.* Codington, Ib. 513, *arguendo*;) namely, that an action might have been brought in the name of the trustees, for the recovery of damages for the non-performance of the covenant, and therefore, to avoid the circuity of bringing such an action, and afterwards of applying to equity to have the damages invested in land, and settled according to the terms of the articles, and also because a court of law has no means of apportioning the damages, according to the respective rights of the parties, equity would enforce the specific execution of the covenant. "But such a ground," says the court below, "is treated as forming an exception to the general rule, (1 Ves. jr. 74,) and leaves this, and other cases where the same ground does not exist, subject to the operation of the general rule."

Indeed, as Mr. Atherly observes (p. 140, Law Library edition), "it does not very clearly appear on what ground Lord King founded his decree"; but unless it be founded on the above suggestion as to the right of the trustees to recover damages, or as a kind of satisfaction or recompense to the brothers for the disappointment they might experience from the rules of law giving the settler an absolute interest in a sum of money which had been bequeathed to the settler by another brother, and which was bequeathed over to the brothers claiming under the articles, if he, the settler, died without issue, it cannot be considered as sufficient authority to break down the well-established general rule.

The decision of Lord King was, it is true, affirmed by the House of Lords, (4 Bro. P. C. 26,) but, as Mr. Atherly says, (p. 141,) there seems reason to suppose that they might be materially influenced by a circumstance, which Lord King does not appear to have adverted to, or even to have been acquainted with; namely, "that the settler's father (who was a party to the articles) insisted that the lands agreed to be purchased should be limited in remainder to his two younger sons (the plaintiffs), and afterwards declared that it should never have been a match if the intended wife and her friends, as well as the settler, had not agreed to it."

Lord King's decree acquires no additional weight, therefore, by the affirmance of the Lords, if they were influenced by this new feature, as is extremely probable; but the case resolves it into the principle recognized in the second class of cases, and is no authority to sustain the argument of the plaintiff's counsel.

The general rule remains, therefore, unassailed, — the exceptions do but prove it, — and the very cases which establish these exceptions affirm, in express language, or by necessary implication, the general principle, that a mere volunteer can have no assistance from a court of equity, at his instance, to enforce an executory contract. As our case cannot be brought within the range of any of these exceptions, we have the full protection of this well-established rule.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States held in and for the District of the State of Georgia.

The bill was filed by the complainants in the court below, to obtain the possession of the undivided half of an estate, embraced in a marriage settlement between John Neves and Catharine Jewell, entered into in contemplation of marriage, and which shortly afterwards took place.

Each of the parties, being the owner and in possession of considerable estates at the time, entered into the following agreement : —

" Articles of agreement made and entered into this 17th of February, 1810, between John Neves and Catharine Jewell, widow, and relict of the late Thomas Jewell, (deceased,) all of the State and county aforesaid as follows :

" Whereas a marriage is shortly to be had and solemnized between the said John Neves and the said Catharine Jewell, as aforesaid, are, as follows, to wit : — that all the property, both real and personal, which is now, or may hereafter become, the right of the said John and Catharine, shall remain in common between them, the said husband and wife, during their natural lives; and should the said Catharine become the longest liver, the property to continue hers so long as she shall live ; and at her death the estate to be divided between the heirs of her, said Catharine, and the heirs of the said John, share and share alike, agreeable to the distribution laws of this State made and provided. And, on the other hand, should the said John become the longest liver, the property to remain in the manner and form as above."

The parties after the marriage held and enjoyed their respective estates in common, during their joint lives, and until the death of John in 1828; and after his death the same remained in the possession and enjoyment of Catharine, the survivor, until her decease in 1844; since which time, it has been in the possession and under the control of William F. Scott, her second husband, and one of the defendants. The other defendant is the executor under the will of John Neves, the husband.

The complainants are the brother and nephew, and only surviving heirs, of John Neves; and claim a moiety of the estate, according to the terms of the marriage settlement. And the questions presented in the case are upon the effect to be given to this instrument.

The argument, on the part of the defendants, is, that the deed is to be regarded in the light of marriage articles, creating executory trusts to be carried into execution at some future day by an instrument that would operate to vest the estates according to the stipulations in the articles. And that, as the agreement is founded upon the consideration of marriage, and other considerations moving only between the parties, the complainants, being the collateral relatives of John Neves, do not, according to the rules of equity applicable to this species of contract, come within the reach and influence of the considerations, so as to entitle them to the interposition of a court of chancery to enforce the execution of the trusts. That where the trust is executory, and rests merely in covenant, the court will interpose only in favor of one of the parties to the instrument or the issue, or one claiming through them; and not in favor of remote heirs or strangers, though included within the scope of the provisions of the articles. (Fonbl., book 6, ch. 6, § 8; Atherly on Settlements, ch. 5, p. 125; 2 Story's Eq. §§ 986, 987; 2 Kent's Com. 173.)

Upon this ground, the court below sustained the demurrer to the bill, and denied the prayer of the complainants.

The numerous cases to be found in the books, several of which were referred to in the argument on this subject, are by no means uniform or consistent; and the general rule as stated, and upon which the case below turned, has been made the subject of so many exceptions and qualifications, that it can scarcely, at this day, be regarded as authority. (Vernon *v.* Vernon, 2 P. Wms. 594; Edwards *v.* Countess of Warwick, Ib. 171; Osgood *v.* Strode, Ib. 245; Ithell *v.* Beane, 1 Ves. sen. 215; S. C., 1 Dick. 132; Stephens *v.* Trueman, 1 Ves. jr. 73, 74; Pulvertoft *v.* Pulvertoft, 18 Ves. 90; 2 Kent's Com. 172, 173; Atherly, 145 – 148.)

The case of Vernon v. Vernon is a direct authority in support of the limitation in question; and the other cases to which I have referred are distinguishable only upon very technical and refined reasoning, hardly reconcilable with a common-sense administration of justice. The principle is, that, in order to bring collateral relatives within the reach and influence of the consideration, there must be something over and above that flowing from the immediate parties to the marriage articles, from which it can be inferred that relatives beyond the issue were intended to be provided for; and that, if the provision in their behalf had not been agreed to, the superadded consideration would not have been given.

That, for any thing short of this, they will be regarded as volunteers, in whose favor a court of equity will not interpose against the settler, or any one claiming under him.

But while the rule seems generally to have been adhered to in the form in which it is stated, it has been practically disregarded; as the slightest degree of valuable consideration imaginable is seized hold of to give effect to the limitation.

And it need not be made to appear that these slight considerations were intended to support the provision for the distant relatives, it being assumed by the court as a presumption of law.

The Lord Chancellor in Stephens v. Trueman observed, " The old rule was, and is now, (although of late not so strictly adhered to,) that none can come here for a specific performance, who do not come under the consideration of the agreement; as that it shall not be for the benefit of collateral branches in marriage articles; but, as agreements are entire, and the several branches may have been in view, the court has in later cases laid hold of any circumstances to distinguish them out of it, still preserving the general rule."

And in Edwards v. The Countess of Warwick, the doctrine is stated still more strongly, where the Chancellor observed, " that the consideration for the precedent limitations on a marriage settlement has been applied even to the subsequent ones; as where, on a consideration of marriage, and portion, land has been settled on the husband for life, and then to the wife for life, remainder to the children, with remainder to a brother, these considerations have extended to the brother; and the reason is, because it may be very well intended, that the husband, or his parents, would not have come into the settlement, unless all the parties thereto had agreed to the limitation to the brother."

The result of all the cases, I think, will show, that if, from

18 *

the circumstances under which the marriage articles were entered into by the parties, or as collected from the face of the instrument itself, it appears to have been intended that the collateral relatives, in a given event, should take the estate, and a proper limitation to that effect is contained in them, a court of equity will enforce the trust for their benefit.

They will not be regarded as volunteers outside of the deed, but as coming fairly within the influence of the considerations upon which it is founded; the consideration will extend through all the limitations for the benefit of the remotest persons provided for consistent with law.

The provisions in the deed before us are very peculiar, and different from any that have come under my observation in an examination of the cases; and, of themselves, would, probably, be sufficient to distinguish it from all of them in which the general rule has been applied.

The collateral relatives of the parties to the instrument seem, not only to have been within their contemplation at the time, but to have been the direct and special objects of their bounty.

None of the limitations are in favor of the issue of the marriage, *eo nomine*, usually found in these instruments; but are in favor of the several heirs of each of the parties, as a class, the estate to be divided equally between the two. The settlement seems to negative the expectation of issue, and seeks at once to provide for the collateral relatives; as the peculiar phraseology would hardly have occurred to the most inexperienced draughtsman, if he had had in his mind at the time the issue of the marriage.

It is true, the children or grandchildren coming within the description of the limitation to the heirs of each of the parties, being the heirs of both, would, if they survived the parents, take the estate to the exclusion of the collateral branches; but this would seem to be an accident, rather than a result to be derived from the frame of the limitation, as that looks directly to a provision for the separate and several heirs of each of the parties, and to an equal division of the estate between them.

Each of the parties appears to have been in the possession of considerable estates (which was the largest is not stated); and, on the event of the marriage, both were to become common property during their joint lives, and the life of the survivor; and, instead of providing for the return of the separate estate of each, on the termination of the lives, into the channel from which it was diverted by the marriage contract, they agree that the joint estate shall be divided equally, and that each moiety shall take that direction and be distributed in their respective families.

To refuse to carry into execution this arrangement, therefore, would be, in effect, to overthrow the settlement; and defeat, not only the manifest intent, but the leading design, of the parties entering into it.    None of the cases relied on, I think, go this length.

But, without pursuing this branch of the case farther, or placing our decision upon it, there is another ground, unembarrassed by conflicting authorities or refined distinctions, which the court are of opinion is decisive of the questions involved in favor of the complainants.    And that is, that the deed in question is a marriage settlement, complete in itself, — an executed trust, which requires only to be obeyed, and fulfilled by those standing in the relation of trustees, for the benefit of the *cestui, que trusts*, according to the provisions of the settlement.

The defendants are not called upon to make a settlement of the estate, under the direction of the court, from imperfect and incomplete marriage articles, and which might or might not be subject to the objections stated.

The settlement has been made by the parties themselves: and the only question is, whether the defendants shall be compelled to carry it into execution.

The distinction between trusts executed and executory is this : — a trust executed is where the party has given complete directions for settling his estate, with perfect limitations; an executory trust, where the directions are incomplete, and are rather minutes, or instructions for the settlement.   (1 Mad. Ch. 558; 2 Story's Eq. § 983.)

The former, as observed by Lord Eldon, in one sense of the word, is a trust executory; that is, he observes, if A. B. is a trustee for C. D., or for C. D. and others, that, in this sense, is executory, that C. D., or C. D. and the other persons, may call upon A. B. to make a conveyance, and execute the trust : but these are cases where the testator has clearly decided what the trust is to be; and as equity follows the law where the testator has left nothing to be done, but has himself expressed it, there the effect must be the same whether the estate is equitable or legal.   (Jervoise *v.* The Duke of Northumberland, 1 Jac. & Walk. 550.)   The remarks were made for a different purpose than the one in view here; but they afford a clear illustration of the distinction stated.

Now, the only plausible ground for contending that this instrument imports but mere articles, as contradistinguished from a marriage settlement, is, that in the caption it begins, " Articles of agreement," &c. ; but it is to be observed, that the deed

is drawn up somewhat unskilfully, and without much regard to form; and that the draughtsman had not probably in his mind, if even he was aware of, the technical or legal distinction between the two instruments; and besides, and what is more material to the purpose, we must look to the body of the instrument, its provisions and tenor, and to the intent of the parties, as collected from the whole, in order to determine its character and effect.

Courts will endeavour, as much as possible, to give effect to marriage agreements according to the understanding of the parties; and where they evidently considered the instrument in the light of a final and complete settlement, not contemplating any future act, it will be so regarded; and in order to effectuate their intent, one part of the instrument even will be taken as a complete settlement of the estate comprised in it, and another part as mere articles.

In the case before us, every portion of the estate is definitely settled, both in respect to the amount of the interest, and the particular persons who are to take; the limitations leave no part undisposed of; estates for life, and in remainder in the property, are limited with all the formality required to enable a court of equity to carry the trust into execution, according to the intent of the settlers. There is nothing in the instrument contemplating any further act to be done by them.

The practical construction, also, accords with that derived from their language. The estate was possessed and enjoyed under it, by both or one of them, from 1810 to 1844, a period of thirty-four years.

If a third person had been interposed, as trustee of the estates, with the limitation as found in the instrument, no one could, for a moment, have doubted but that the settlement would have been final and complete; and yet it has long been settled, that equal effect will be given to it in equity, when made only between the parties themselves; each one will be regarded, so far as may be necessary to effectuate their intent, as holding their several estates as trustees for the uses of the settlement. (2 Story's Equity, § 1380; Fonbl., book 1, ch. 2, § 6, note *n;* 2 Kent's Com. 162, 163; 9 Ves. 375, 383; 3 Johns. Ch. 540.) There can be no objection to the execution of the trust on this ground.

It appears from the bill, that portions of the estate in the possession of the defendants were acquired by the parties to the settlement, subsequent to its execution, and it is supposed that this consideration is material in determining its character; and that if it should be regarded as a settlement, and not mere

articles, these subsequent acquisitions would not be bound by it. But this is a mistake.

The instrument provides for subsequently acquired property by either of the parties, as well as the present, and in such cases there is no doubt but that it follows the limitations of the settlement, the same as the property then in possession. (10 Ves. 574, 579; 9 ib. 95, 96; 7 ib. 294; 6 ib. 403, note, Boston ed.)

Looking, then, at the instrument as complete in its directions and limitations in the settlement of the estate, and as presenting the case of an executed trust, the difficulty set up against the complainants when claiming under marriage articles disappears; for, being the beneficial owners, and vested with the equitable title, a court of equity will interpose, and compel the trustee, or any one standing in that relation to the estate, to vest them with the legal title.

We are of opinion, therefore, that the court below erred in giving judgment in favor of the defendants on the demurrer to the bill, and that the decree should be reversed.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Georgia, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court, for further proceedings to be had therein, in conformity to the opinion of this court.