SIDNEY BLUMENTHAL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34092. Promulgated April 12, 1929.

*Walter H. Liebman, Esq.*, for the petitioner.
*Brice Toole, Esq.*, for the respondent.

OPINION.

LITTLETON: The antenuptial agreement made in Alsace-Lorraine, as between petitioner and his wife, remained in force during 1925, the taxable year in question, but it did not have the effect of changing the law of New York, in which State the community property system does not prevail, nor did the agreement operate to relieve the petitioner from taxation under the Federal statute upon his entire earnings.

Notwithstanding the rights and privileges of petitioner and his wife as they existed under the antenuptial agreement and community property law of Alsace-Lorraine, neither was effective to make an exception in their favor in New York in the matter of reporting their taxable income arising from the salary of the husband, first earned and received by him in New York from two corporations.

The income in question, one-half of the salary of petitioner for 1925, was not in existence until more than twenty years after the agreement was made. Under the laws of New York and section 213 of the Revenue Act of 1924, the salary of petitioner was taxable income to him before any rights of his wife could vest by virtue of the antenuptial agreement.

Neither the Federal statute nor the law of New York was affected or changed by the community system of property prevailing in Alsace-Lorraine, where the antenuptial contract was made.

As the community system of property does not exist in New York, the wife of petitioner could acquire no vested interest in his 1925 salary by virtue of the law of Alsace-Lorraine, or by reason of the

antenuptial contract, in such way as to prevent the entire salary being taxable to the petitioner. In *In re Black*, 123 N. Y. Supp. 371, 373, the court said:

An assignment of something which has no present, actual or even potential existence when the assignment is made does not operate to transfer the legal title to that thing when it does come into existence. * * * Such an instrument, if made in good faith for a valuable consideration and not void as against public policy, operates as an executory contract to transfer such after acquired property, and creates an equitable lien thereon. * * * But the legal title remains in the assignor. * * * And at law that title is not transferred until either the equitable lien is enforced by judicial decree or some new act intervenes by which the assignor puts the assignee in possession thereof.

In *Bing* v. *Bowers*, 22 Fed. (2d) 450, the court states:

To permit the assignor of future income from his own property to escape taxation thereon by a gift grant in advance of the receipt by him of such income would by indirection enlarge the limited class of deductions established by statute. As long as he remains the owner of the property the income therefrom should be taxable to him as fully, when he grants it as a gift in advance of its receipt, as it clearly is despite a gift thereof immediately after its receipt.

In *Ormsby McKnight Mitchel*, 1 B. T. A. 143, 148, this Board said:

* * * No one is permitted to make his own tax law and if it were permitted to modify the express provisions of a taxing statute by agreement any taxpayer could say what should or should not be income. To merely state the proposition is to expose its fallacy, and it is of no importance that the taxpayer, as stated in his brief, believes in the community property theory in effect in some of the States. The answer to such a contention is that even if it would effect the result desired it is not in force in New York State and that a community created by positive law has attributes which cannot be given effect in a community created by agreement. * * *

We think the Commissioner properly held petitioner liable for tax upon his entire salary for the taxable year. Cf. *Florence V. Cruickshank*, 13 B. T. A. 508.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

---

Love, dissenting: Regardless of the fact that I dislike to write an opinion dissenting from a decision of the Board, I feel impelled to write this one because I believe and feel that the prevailing opinion and decision are fundamentally wrong. As I view the situation, the decision seriously curtails the inviolable right of contract, a right held sacred in our jurisprudence, both Federal and State.

Community property laws are not here involved. However, by reason of the fact that the parties to the contract in question were,

when the contract was entered into, resident citizens of a country where community property laws prevail, and especially because the parties to the contract make use of the term "community property" in that contract, we may look to those laws if need be in construing the terms of that contract and determining just what the parties meant by the wording therein employed.

There are no controverted facts in issue.

The questions to be answered are:

1. What is the legal status of the antenuptial contract entered into by and between the petitioner and his wife while citizens and residents of Alsace-Lorraine? Will the courts of New York uphold and enforce the terms of that contract since the parties to it have immigrated into and become residents of that State?

2. What are the terms and conditions of that contract?

3. A third question has been injected into the controversy by reason of a contention made that regardless of how the two first questions be answered, the Federal income-tax laws require that a married man's salary be deemed, for tax purposes, to be wholly his own as of the date received by him.

I desire to consider the questions suggested in the order presented.

What is the legal status of the contract in question? There is no question raised in regard to the validity of the contract as a contract between two persons competent to enter into a contract. There is no question raised as to the legal right of the parties to bind themselves to perform the terms and conditions of that contract. None of its terms or conditions are immoral, against a sound public policy, or antagonistic to any law in the country where executed, or in the after-acquired domicile.

The contract being an antenuptial contract, based on the consideration of marriage, is a binding, legal contract between them, and is irrevocable by either of them so long as the marriage relation exists. See *DeCouche* v. *Savetier*, 3 Johns. Ch. (N. Y.) 190.

Briefly, the facts in the *DeCouche* case, *supra*, are that DeCouche and his wife were resident citizens of France and married in Paris. Prior to their marriage they entered into a contract which provided that there should be a community of property between them, and that in case of the death of either without lawful issue, all the interest in the property held by the one so dying should go to the survivor. The husband after marriage abandoned his wife, came to New York and amassed a large estate of personal property, and died in New York without lawful issue. It was held that the estate went to the wife, under the contract, to the exclusion of the husband's relatives.

France is a community property country, and New York is a common law State and has no semblance of community property laws in

her jurisprudence. Yet the courts of that State recognized the validity of that contract, which provided for the community property holding of assets of that conjugal couple, and enforced its terms and conditions even to the extent of decreeing the whole estate to the wife, the husband dying without lawful issue.

The case of *Neves* v. *Scott*, 9 How. 196; 13 L. Ed. 102; is one where a man and woman who were resident citizens of Georgia, which is a common law State and has no community property laws, entered into an antenuptial contract which provided for a community holding of property which should be acquired during coverture, as well as other conditions relative to property rights, none of which conditions were according to Georgia's laws of descent and distribution. The husband died first, and several years after his death the wife died. A contest then arose between the heirs of the husband and the heirs of the wife, and while the validity of the contract was not directly brought in issue, all parties, including the court, assumed its validity, the validity of the contract being necessarily involved in the case.

Nearly every State in the Union has had occasion to consider the validity of antenuptial contracts modifying the laws of the domicile of the contracting parties, or providing conditions not in accord with the laws of the State to which the parties subsequently moved. So far as I have been able to ascertain, the courts of every State that have considered that question sustained the contract.

An interesting case arose in England, *De Nichols* v. *Curlier*, 1 A. C. (1900) 21. (See discussion of case in McCay on Community Property, p. 110, sec. 142.)

DeNichols and wife were resident citizens of France, and married in Paris. After marriage they went to England to reside, and he became a naturalized British citizen. After amassing a considerable fortune, he died testate, and in his will he attempted to dispose of all the property acquired by him in England. The will being contested, it was held by the House of Lords that by the laws of France, where he was married, only one-half of his accumulations was his, and evidently engrafted upon the marriage relation an implied antenuptial contract, which embodied the laws of his domicile at the time of marriage, and held that he was authorized to dispose of only one-half of the estate. England is a common law country, in fact, the mother of the common law, and her courts enforced the community property laws of France, notwithstanding the fact that no express contract existed between the parties. Our courts would probably not go to the extent of engrafting an implied contract upon the marriage relation. However, the New Jersey court, in *Harrall* v. *Wallis*, N. J. Eq. Repts., 10 Stewart 458, by coupling residence

in France, during coverture, with the marital laws of France, when such marriage was of man and woman residents of that country, applied and enforced such laws of France to the exclusion of beneficiaries of a will executed prior to marriage and involving property located in America. In this case there was no antenuptial contract. Moreover, our courts do favor marital contracts (*Neves* v. *Scott, supra*) and invariably enforce their terms and conditions when they embody no conditions repugnant to morals, sound public policy, or statutory laws of the *loci fori*. An illuminating discussion of the subjects here involved, with copious citations of authorities, may be found in Ruling Case Law, vol. 13, p. 1011, *et seq*.

The next question to consider is: What is the legal meaning or import of the contract in question? Is it an executed, or an executory contract. Does it establish a status of the parties that, *ipso facto*, fixes the property rights of the parties, or does it only promise that certain things shall be done in the future. To be explicit, does it provide that income, as it is earned during coverture, as salary paid to either husband or wife, shall belong wholly to the one so receiving it, and by such one thereafter divided, and one-half assigned to the other; or does it mean that as and when such salary is paid, one-half of it, *ab initio*, belongs to the wife and one-half to the husband?

It seems to me that the clear import of the phraseology used in the contract precludes a construction otherwise than the latter of the two above suggested. A partnership agreement between two men is not different in substance and no more specific. I do not believe it would be seriously contended that in the case of law partners, A and B, that a fee earned by A, working alone on a given case, is wholly his own when received, and that he is only obligated by the contract of partnership, to assign one-half of it to B.

If any doubt remain as to the import of the contract here in question, as to what the parties to that contract meant by the phraseology therein employed, we may look to the principles underlying the community property laws.

Blumenthal and wife, at the time the contract was entered into, lived in a country where community property laws prevail. That they were familiar with those laws is evidenced by their reference in the contract to those laws, and it is further evidenced in that contract that they meant to embody the spirit and principles of those laws in that contract. They made the contract in 1903, long prior to the enactment of income-tax laws in this country. The *bona fides* of such contract can not be questioned. The spirit and principles of community property laws are founded on the hypothesis or idea that when a man and woman marry, they embark on life's voyage

with a common purpose or goal in view. That the function and duty of the wife are to remain at home, make a home for the family, bear and rear the children that come to them, and make, as she only can make, a happy home. The function and duty of the husband are to get out and into the business world and make the income that comes to them. That in such endeavor each contributes services to the common purpose of equal value, and that each, of right, is entitled to one-half of all that comes to them. Such is the purport of the contract here involved. Such are the self-imposed obligations of the parties to that contract. To render a decree that tends to impair those obligations, repudiates the obligations of a contract solemnly entered into in writing under seal. .I can never agree to such a decree.

But, thirdly, it is argued that the Supreme Court has said in the *Robbins* case, that regardless of the legal ownership of the income to husband and wife, because the statutes of California give to the husband the management and control of that income, the husband is the target the Government must shoot at, and that he is liable for the tax. In the instant case we have no such statutory provision. We have, here, a contract, and that contract has no stipulation for the management and control of the income. Certainly, the presumption is that each manages and controls his or her own property.

It is further argued that, in *Burk-Waggoner Oil Assn.* v. *Hopkins*, 269 U. S. 110, the court held that, regardless of the character of an organization as per the laws of its domicile, the Federal Government had the constitutional right to prescribe that an organization with certain characteristics shall be classed for income-tax purposes differently from the classification given it by state laws. That question is not here involved. The income-tax statutes have provided for separate return, by a wife, of her income. Joint return for husband and wife is a privilege granted at the option of the parties. If they elect to make separate return it is their legal right so to do.

The petitioner here is not seeking to evade his taxes. He and his wife, each, claimed one-half of their joint income, and claimed the right to make separate return, each, of one-half of that income. The Commissioner determined that the whole income belonged to the husband, and demanded that he include the whole in his return. From that determination he appealed to this Board. I believe judgment should be for the petitioner.

GREEN and SIEFKIN concur in this dissent.