Rec., secs. 1, 249, 257. We fail to find any authority which justified him in running the store.

The receiver is, under certain circumstances, justified in retaining counsel to advise him (Id. sec. 261); but, if he does so, he must be prepared to show the necessity. In this case he has not done so. It is a cardinal rule, in regard to matters of receivership, that the receiver is at all times subject to the control of the court. He is but a hand of the court, and all of his actions must pass under the watchful eye of the chancellor, and we think it a safe rule to presume that the action of the chancellor in passing upon the accounts of the receiver was correct, in the absence of a clear showing that it was either erroneous or illegal. In this case we think it is clear that his action was perfectly correct. The judgment of the lower court will be affirmed.

CLAIM for attorney's fees.

McFIE and LEE, JJ., concur.

---

[No. 500. January 25, 1893.]

VICENTE CHAVEZ ET AL., PLAINTIFFS IN ERROR,
v. BARBARA CHAVEZ DE SANCHEZ,
DEFENDANT IN ERROR.

SPANISH LAND GRANT—HOMESTEAD PATENT—TITLE—EVIDENCE.—In an action of ejectment for the recovery of land claimed by plaintiff under a homestead patent from the United States, and held adversely by defendant under a claim of grant from Spain made prior to 1750, but not confirmed by congress, or by any tribunal authorized by congress to examine into and determine the validity of such titles in New Mexico, the patent will prevail, although the holder under such grant has a perfect title from the original grantee, and papers offered in evidence tending to establish such title were properly rejected.

ID.—HOMESTEAD ENTRY—FINAL PROOF—EVIDENCE.—In such action, where it appeared the homestead entry was made in 1882, and final proof was made thereon in 1883, evidence offered by defendants to prove the presentation of their claim to the surveyor general of New Mexico in 1887 was also properly rejected, although the homestead

patent was not issued until after that date. The patent being founded upon and relating back to the entry, the land was segregated previous to the presentation of defendants' claim, and such presentation was of no value prior to confirmation.

ID.—VALIDITY OF PATENT—INADMISSIBILITY OF COLLATERAL EVIDENCE TO ATTACK.—Nor was it error, in such case, to refuse to admit evidence offered by defendants to show that when plaintiff entered upon the patented land embraced in her homestead she knew that said land was claimed by defendants as a part of the Spanish grant. The plaintiff, holding under the patent, had a superior right of possession vested in her thereby, and the patent, being valid on its face, was not subject to collateral attack.

ID.—JURISDICTION—PATENT—CONCLUSIVE EVIDENCE OF CONVEYANCE.— In such action, the district court had no power to take cognizance of the title claimed under the Spanish grant; that power was expressly reserved to congress by the act of July 22, 1854, and subsequently to the court of private claims by the act of March 3, 1891, and, the land in controversy being part of the territory ceded to the United States by the treaty of cession, of which the court took notice, the patent was conclusive evidence of the proper conveyance of the land, and that the United States was the rightful owner of the same when the patent was issued.

ID.—IMPROVEMENTS—EVIDENCE.—The defendants had no right, in such case, to recover the value of the improvements made by them upon the land in controversy, as claimed under section 2581, Compiled Laws. That section of the statute was not intended to be available in behalf of one wrongfully in possession. Moreover, the land embraced in the homestead patent must be considered as part of the public lands of the United States, and the power of congress to dispose of the public domain can not be interfered with by any state or territorial legislation, nor can such legislation deprive the grantee of the possession and enjoyment of the property granted. The court did not, therefore, err in excluding evidence of the value of the land in question and the improvements made thereon.

ERROR, from a judgment for plaintiff, to the Second Judicial District Court, Valencia County. Judgment affirmed.

The facts are stated in the opinion of the court.

F. W. CLANCY for plaintiffs in error.

A patent of the United States is void if the land described therein has been reserved by, or never

belonged to, the government. Morton v. Nebraska, 21 Wall. 660; Polk v. Wendell, 9 Cranch, 99; Same v. Same, 5 Wheat. 301; Patterson v. Winn, 11 Id. 383, 384; Minter v. Crommelin, 18 How. 88; Reichart v. Phelps, 6 Wall. 165; Minnesota v. Bachelder, 1 Wall. 115; Marsh v. Brooks, 8 How. 232, 233; Sabariego v. Mavericks, 124 U. S. 282, 283; Wright v. Roseberry, 121 U. S. 520.

In this case the land in question never belonged to the United States, the title having absolutely vested in Nicolas de Chavez in 1739. The Spanish governor had powers little less extensive than the king himself. 1 White's Recop. 368–370; United States v. Clarke, 451, 452; Same v. Peralta, 19 How. 347, 348.

The change of sovereignty, irrespective of any treaty obligations, had no effect upon private rights. United States v. Percheman, 7 Pet. 86, 87; Dent v. Emmeger, 14 Wall. 312; Foster v. Neilson, 2 Pet. 314, 315. See, also, Botiller v. Dominguez, 130 U. S. 250.

The decision of this court in Chavez v. Whitney, 4 N. M. (Gil.) 611, that "no jurisdiction over such claims in New Mexico was conferred upon the court," is based upon some observations in Tameling v. Emigration Co., 93 U. S. 662, which were not at all necessary to the decision rendered, and is traceable to the influence of earlier decisions under the Florida treaty. See United States v. Arredondo, 6 Pet. 734; Foster v. Neilson, 2 Id. 314; United States v. Percheman, 7 Id. 85. Also Botiller v. Dominguez, 130 U. S. 249; United States v. Roselius, 15 How. 38.

If, under previous conditions, the court was without jurisdiction to protect the holder of a perfect title against the United States, those conditions have been changed by the act of congress of 1891. He is left, like any owner of property, to the protection of the ordinary courts of justice. Fremont v. United States, 17 How. 553, 554.

The land in controversy was reserved from sale or other disposition by the act of congress of 1854. 10 U. S. Stat. at Large, 309.   The defendants, in any event, were entitled, under the statute, to have the value of their improvements assessed and declared a lien on the land.   Comp. Laws, sec. 2581.

NEILL B. FIELD for defendant in error.

The ownership of the land embraced in the patent in this case was a question for the political department of the government, and not a question for the courts. Chavez v. Whitney, 4 N. M. (Gil.) 611; Tameling v. Emigration Co., 93 U. S. 661; Pinkerton v. Ledoux, 129 U. S. 346.

A patent for land is the highest evidence of title, and is conclusive as against the government, and all claimants under junior patents or titles, until set aside or annulled, unless absolutely void on its face.   Stone v. United States, 2 Wall. 525; Hooper v. Scheimer, 23 How. 235; Johnson v. Towsley, 13 Wall. 72; Gibson v. Chouteau, Id. 92.

Congress, so far from recognizing the title set up by defendants, has in effect declared that, in all such cases as this, the patent of the government is the superior title.   Pub. Stat. U. S. 1890, 1891, p. 854, secs. 8, 14.

It is the province of the political department of the government to determine for itself how such titles shall be adjudicated.   Botiller v. Dominguez, 130 U. S. 238; U. S. v. Repentiguy, 5 Wall. 211.

If, in the exercise of this power, congress enacts a law which is in conflict with a treaty of the United States with a foreign power, the courts are bound to follow the statutory enactments of their own government. Botiller v. Dominguez, 130 U. S. 238.

Until the passage of the act of March 3, 1891, creating a court of private land claims, no tribunal

existed upon which jurisdiction had been conferred. Chavez v. Whitney, 4 N. M. (Gil.) 611; Tameling v. Emigration Co., 93 U. S. 661.

As between the United States and claimants of lands under grants such as that relied on, the court of private land claims has exclusive original jurisdiction. Pub. Stat. U. S. 1890, 1891, p. 854, chap. 539.

Section 2581, Compiled Laws, 1884, can have no application in this case. It would be an interference with the power of congress in the disposal of the public domain. Gibson v. Chouteau, 13 Wall. 92; King v. Thomas, 12 Pac. Rep. 865.

McFIE, J.—This was an action of ejectment, brought in the district court for Valencia county by defendant in error, who was plaintiff in the court below, to recover from the plaintiffs in error the possession of a portion of the land described in a homestead patent from the United States dated April 3, 1889, and embracing one hundred and fifty-seven and thirty-six hundreths acres. Defendants below admitted the fact of their being in possession of a portion of the land embraced in the patent, and attempted to defend against the patent by showing that the land was a part of a perfect grant made to one Nicolas de Chavez in the year 1739, and long prior to the cession of said land by the republic of Mexico to the United States in 1848 by the treaty of Guadalupe Hidalgo. It was also admitted on the trial below that the defendants were heirs or purchasers from heirs of said grantee, and that the land described in the patent was within the exterior boundaries of what was claimed to be the Nicolas de Chavez grant. Trial was had at the September, 1891, term, before the court and a jury, and to maintain the issues for the plaintiff the patent was introduced in evidence, and the defendants admitted that the homestead entry upon which the patent is founded was made by plaintiff December 27, 1882; and that final proof

was made thereon August 15, 1883, and the ouster charged, and possession of defendants as to part of the lands embraced in the patent was also admitted. The defendants having pleaded not guilty, and with the plea filed notice that upon the trial they would prove the improvements made by them upon the land in controversy, and also the value of the same, offered in evidence a petition of Nicolas de Chavez to the governor and captain general of New Mexico for a grant of land; the grant by said governor to said Nicolas de Chavez; the document showing the act of judicial possession for the land granted; a subsequent order of said governor as to boundaries, and a decision or certificate of Bernardo Antonio Bustamente Tagle, lieutenant governor, as to a disputed boundary, together with translation of the same; and offered to prove the genuineness of the said petition, grant, act of possession, order, and decision, by the evidence of William M. Tipton, official translator of the office of the surveyor general; and the plaintiff admitted that Mr. Tipton, if sworn and put on the stand, would be competent and fully qualified to testify as an expert concerning such papers, and that he would testify that he had made a careful and critical examination of the handwriting and signatures in said documents, of the paper on which they were written, and of their appearance and condition generally, and comparison thereof with many other similar papers admitted and known to be genuine, and that from such examination and comparison he is satisfied that these documents are genuine, and were actually made and signed as they purport to have been, and especially that the official signatures appearing in said documents are genuine signatures of the officers named; and plaintiff further admitted that she could offer no evidence in rebuttal of said evidence by Tipton, but plaintiff objected to the admission of said documents, or either of them, in

evidence, or of any evidence relative to them, as being irrelevant, incompetent, and immaterial, which objection was sustained by the court, and said documents and the evidence relative thereto were excluded by the court; to which rulings of the court exceptions were properly saved by the defendants. Defendants also offered to prove, by the records of the office of the surveyor general, produced in court, that in April, 1887, a petition was filed in the office of the surveyor general of the territory of New Mexico for an approval of said grant, and that in December of the same year the surveyor general reported upon said grant, and forwarded his report to the department of the interior at Washington, D. C., to be laid before congress, in pursuance of an act of congress of 1854, which was objected to by the plaintiff. The objection was sustained by the court, and the evidence offered was excluded, and the defendant duly excepted. The defendants further offered to prove by Francisco Chavez y Armijo, that at the time of the alleged settlement and occupation by the plaintiff and her deceased husband they knew that the land was claimed under this grant; and, further, that the plaintiff entered into possession of the premises in dispute as one of the heirs of Nicolas de Chavez, and knew at the time of making her homestead entry that the land in question was claimed under said grant. This evidence tendered by the defendant was excluded by the court upon objection of plaintiff's counsel, to which ruling of the court defendants saved an exception. The defendants further offered to prove the value of the land in controversy, and also the value of the improvements made thereon by the defendants, and by those from whom they claimed title; but, upon objection by plaintiff's counsel, this evidence was also excluded, and the defendants duly excepted to the ruling of the court. Thereupon, the defendants having closed their case, and no

evidence in rebuttal being offered, the jury, by direction of the court, returned a verdict in favor of the plaintiff. The defendants moved for a new trial, but the court overruled the motion, and entered judgment for the plaintiff upon the verdict of the jury. The case is in this court upon writ of error, in which the plaintiffs in error assign nine grounds of error, and seek a reversal of the judgment of the court below upon them.

The first assignment of error goes to the merits of this case. The decision of the court upon this assignment practically disposes of all other assignments of error with the exception of the fifth, which is based upon the refusal of the court to permit evidence to be introduced showing the value of the land in controversy and the value of the improvements. Counsel on both sides have with commendable fairness endeavored to present to this court for its determination this question: Can a plaintiff in ejectment, relying upon a patent from the government of the United States, be defeated by the defendants showing that the lands described therein are part of a private land claim deriving its validity from another sovereignty, but never acted upon by the political department of the government of the United States, nor by any tribunal created for that purpose by the political department of our government? The superior right of possession is involved in the decision of this question, and must be awarded to the defendant in error in the event of an affirmance of the validity of the patent title, or to the plaintiffs in error in case the patent shall be held void as against the grant title.

The first assignment of error is as follows: "The court erred in refusing to admit in evidence the documents offered by the plaintiffs in error, which show the making of a grant of land to Nicolas de Chavez, it being

admitted that they were heirs or purchasers from heirs of Nicolas de Chavez, and that the land in question was within the boundaries of such grant." If it was conceded by the plaintiffs in error that the grant to Nicolas de Chavez was an inchoate or imperfect grant, this case would be very readily disposed of, as the courts have uniformly held that questions concerning the title of grants of lands by a foreign government prior to cession to the United States, having at the time of cession imperfect or inchoate titles, requiring some act of the new sovereign to vest in the grantee a perfect title, are reserved by congress to be determined by the political department of the government, or by such tribunal as may be, by act of congress, designated and authorized to determine them. In the case of Dent v. Emmeger, 14 Wall. 108, the supreme court of the United States says: "But inchoate rights, such as those of Cerre, were of imperfect obligation, and affected only the conscience of the new sovereign. They were not of such a nature (until that sovereign gave them a validity and efficacy which they did not before possess) that a court of law or equity could recognize or enforce them. When confirmed by congress they became American titles, and took their validity wholly from the act of confirmation, and not from any French or Spanish element which entered into their previous existence." The case of Grant v. Jaramillo (decided by this court in an opinion January 6, 1892), was a case wherein the plaintiff in ejectment claimed under a patent from the United States for land in New Mexico. The defendant claimed under a grant from the king of Spain, while New Mexico was a province of Spain, but he offered no title papers in evidence, asking the court to presume the grant from uninterrupted occupation since 1825. He also sought to sustain the grant under the prescriptive laws of Mexico in force at the time of cession to the

*SPANISH land grant: homestead patent: title: evidence.*

United States by the treaty of Guadalupe Hidalgo. In the court below, upon the second trial of the cause, the court directed a verdict in favor of the grantee under the patent, and in affirming the judgment of the court below in that case this court, after a careful review of the authorities, said: "It is evident that if the plaintiff in error has any rights to the land in question growing out of the Spanish and Mexican claims set up by him, they are of an inchoate character, and, according to the decisions of the supreme court before referred to, are such as are reserved by congress to be determined by the political department of the government, or by such tribunal as may be, by an act of congress, authorized to try and determine them; and it is equally clear that this court has not been clothed with such authority." But in the case now under consideration plaintiffs in error insist that the grant to Nicolas de Chavez, under whom they claim, was a perfect grant, and the title to the land embraced within the grant became and was a perfect title under the laws, usages, and customs of Spain and Mexico prior to the year 1750, and long prior to the cession of the lands now embraced within the territory of New Mexico by the republic of Mexico to the United States under the treaty of Guadalupe Hidalgo; that under the eighth article of that treaty such title must be regarded as a perfect title by the courts of the United States, and a paramount title to a patent of the United States government embracing lands within the exterior boundaries of such grant subsequent to the grant title, and prior to the determination of the grant title by the political department of the government, or by a tribunal authorized by act of congress to determine them.

Counsel for defendant in error challenges the correctness of the position of the plaintiffs in error, and insists that the patent title is valid, and conclusive in the case; that the court below was without jurisdiction to hear or determine the grant title set up as a defense

in the case; that the court properly excluded from the evidence the title papers offered in support of the grant, and directed a verdict for the defendant in error. From this statement of the issue it seems clear that, if the contention of the plaintiffs in error is sustained, it was error for the court to exclude the documents offered constituting the grant title. It is unnecessary for us to consider or set out in this opinion the documents offered and rejected with a view of determining whether or not they constituted a perfect title under the laws, usages, and customs of Spain and Mexico prior to the cession of these lands to the United States, for the reason that the genuineness of the documents was not questioned; nor was the claim of the plaintiffs in error that these documents, and the testimony relating to them, showed a perfect title under the laws of Spain and Mexico prior to the cession, denied by the defendant in error. The objection of the defendant in error to the proof relating to the grant title, in effect, was this: "That, although the proof offered, if the same had been received, would have established the fact that the title of said grant was perfect under the laws, usages, and customs of Spain and Mexico prior to the treaty of cession of 1848, the evidence was still irrelevant and incompetent, as it did not tend to establish a legal defense; the court having no jurisdiction to determine the value of such titles, prior to the determination of them by the political department of the government, or some tribunal established by act of congress to hear and determine them.

Proceeding, then, to examine the law in relation to grants having perfect or inchoate titles prior to the cession to the United States, we find that this subject has been before the courts of this country ever since Louisiana and the Floridas were ceded to the United States by France and Spain. Many questions have been raised as to the status of the alleged grants upon land

ceded to the United States, the value of their titles, and
the forum in which the rights claimed under them should
be adjudicated. In the determination of these private
land claims in Louisiana and Florida under the act of
congress of 1824, only inchoate titles and equitable titles
were to be considered by the tribunal established by
that act. In cases where the claimant asserted a per-
fect title from the former government, he was remitted
to the courts, there to assert his rights upon the docu-
ments under which he claimed. In Fremont v. U. S.,
17 How. 553, 554, the supreme court of the United
States, distinguishing between the act of congress of
March 3, 1851, for the settlement of private land claims
in California, and the act of 1824, for the settlement of
such claims in Louisiana and Florida, says: "In this
respect it differs from the act of 1824, under which the
claims in Louisiana and Florida were decided. The
jurisdiction of the court in these cases was confined to
inchoate and equitable titles, which required some
other act of the government to vest in the party the
legal title or full ownership. If he claims to have
obtained from either of the former governments a full
and perfect title, he was left to assert it in the ordinary
forms of law upon the documents under which he
claimed." "And when a party, holding such complete
title, is encroached upon, he should find protection in
the judicial tribunals, as he can get nothing by a resort
to confirmations or releases or patents by the political
power which acquired the sovereignty over the terri-
tory, but not the property itself, 'belonging to its
inhabitants.' Chief Justice MARSHALL says, in United
States v. Percheman, 7 Pet. 87: 'The king cedes that
only which belonged to him. Lands he had previously
granted were not his to cede.' And the complete title
to them before obtained is strengthened by no confir-
mation from the United States, who have acquired no
interest in them." Doe v. Eslava, 9 How. 208. Now,

the title set up by the petitioner is a complete legal title, and if he can establish the facts stated in his petition his title is protected by the treaty itself, and does not need the aid of an act of congress to perfect or complete it.   U. S. v. Roselius, 15 How. 38.   Numerous other authorities to the same effect might be cited referring to private land claims in Louisiana and Florida, wherein courts took jurisdiction, and a perfect title was claimed; but it is useless to multiply them. The reason for the law announced in these cases is doubtless found in the fact that the courts held that the treaty of cession acted directly upon the subject, and that the treaty itself was to be regarded as the law, and not as a contract.   U. S. v. Percheman, 7 Pet. 86, 87.   A perfect title, prior to that treaty, was confirmed and established by the language of the treaty itself; and the action of the political department, or the tribunal organized to determine titles to these claims, and make inchoate or equitable titles of foreign inception American titles, were not clothed with authority to investigate titles declared perfect and protected by the treaty itself.   This was the system adopted by the United States government as to these claims in Florida and Louisiana; but it is clear that the United States adopted a different system in the settlement of private land claims in the territory that is now the state of California, which was ceded to the United States by Mexico in 1848.   By the act of March 3, 1851, congress provided a commission, with judicial powers, to examine and determine the validity of these private land claims, with a right to appeal to the courts, which, while called an appeal, was really a trial de novo in the court, where new evidence might be heard; and there can be no doubt whatever that all private land claims, whether held by perfect or inchoate and equitable titles from either Spain or Mexico, were alike required to be presented to that commission for settlement.

In Freemont v. U. S., 17 How. 542, 543, Chief
Justice TANEY, delivering the opinion of the court, said:
"It will be seen from the quotation we have made that
the eighth section embraces not only inchoate or equi-
table titles, but legal titles also, and requires them all
to undergo examination, and be passed upon by the
court. The object of this provision appears to be to
place the titles to land in California upon a stable foun-
dation, and to give the parties who possess them an
opportunity of placing them on the records of the
country in a manner and form that will prevent future
controversy." In U. S. v. Fossatt, 21 How. 445–447,
it is said: "The matter submitted by congress to the
inquiry and determination of the board of commission-
ers by the act of March 3, 1851, and to the courts of
the United States on appeal, by that and the act of
August 31, 1852, are the claims of each and every per-
son in California by virtue of any right or title derived
from the Spanish or Mexican government, and it will
be at once understood that these comprehend all pri-
vate claims to land in California." In U. S. v. Castil-
lero, 2 Black, 17, 158, it was said: "Power to decide
upon the validity of any claim presented to land in
California by virtue of any right or title derived from
the Spanish or Mexican government, as a matter of
original jurisdiction, is, by the act of March 3, 1851,
exclusively conferred upon the commissioners appointed
under the first section of that act." But the case of
Botiller v. Dominguez, 130 U. S. 238, 9 Sup. Ct. Rep.
525, is both elaborate and conclusive. In that case
Dominga Dominguez claimed a private land claim in
Los Angeles county, California, known as the "Rancho
las Virgenes." Believing that she had a perfect title
to the land from Mexico, and that she was not com-
pelled to present the same to the commission, she failed
or refused to present her claim to the board for settle-
ment during the two years allowed for presenting same

under the act of March 3, 1851. Botiller and others then settled on portions of the land embraced in her claim as preemption and homestead settlers. Dominguez brought suit in ejectment to recover possession of the lands they had settled upon, and she was successful in the state court. Appeal was taken to the supreme court of California, and the decision was affirmed by that court. The case was taken to the supreme court of the United States by appeal, where it was reversed and remanded, the court holding that, as the claim had nor been presented to the commission for settlement, as required by act of March 3, 1851, it was invalid, and the land was subject to entry as public domain. Among other things, the court said: "The more important question, however, is: Does the statute, in its provisions for the establishment and ascertainment of private land claims in that country which was derived from Mexico, apply to such as were perfected according to the processes at the time the treaty was entered into? Or is it limited to those imperfect and inchoate claims where the initiation of the proceedings necessary to secure a legal right and title to the property had been commenced, but had not been completed? * * * It is not possible, therefore, from the language of this statute, to infer that there was in the minds of the framers any distinction as to the jurisdiction they were conferring upon this board between claims derived from the Spanish or Mexican government, which were perfect under the laws of those governments, and those which were incipient, imperfect, or inchoate. Undoubtedly, under the powers which these commissioners had to examine into the existing claims, there would be a difference, in the principles of decision which they would apply as to their validity, between a perfected title under the Mexican government and one which was merely incipient, and which the board might reject as unworthy of confirmation for many reasons. * * *

Nor is there any reason in the policy upon which the statute is founded and the purposes it was intended to subserve.   *   *   *   The order of the commissioners or the decree of the court established as. between the United States and the private citizen the validity of such claims, and enabled the government of the United States, out of all its vast domain, to say:   'This is my property;' and also enabled the claimant under the Mexican government, who had a just claim, whether legal or equitable, to say:   'This is mine.'   This was the purpose of the statute, and it was equally important to the object which the United States had in the passage of it that claims under perfect grants from the Mexican government should be established, as that imperfect should be established or rejected.   *   *   *   We are unable to see any injustice, any want of constitutional power, or any violation of the treaty in the means by which the United States undertook to separate the lands in which it held a proprietary interest from those which belonged, either equitably, or by a strict legal title, to private persons.   Every person owning land or other property is at all times liable to be called into a court of justice to contest his title to it. This may be done by another individual, or by the government under which he lives.   It is a necessary part of a free government, in which all are equally subject to the laws, that whoever asserts rights or exercises powers over property may be called before the proper tribunals to sustain them.   *   *   *   Upon the mere question of authority these decisions, of the supreme court of the United States and of the supreme court of California, would be decisive against the judgment of the latter court in this case.   But we are quite satisfied that upon principle, as we have attempted to show, there can be no doubt of the proposition that no title to land in California, dependent upon Spanish or Mexican grant, can be of any validity which has not been

submitted to, and confirmed by, the board provided
for that purpose in the act of 1851; or, if rejected by
that board, confirmed by the district or supreme court
of the United States." Here we have not only the
decision of the court of last resort, but the reasoning
by which the conclusion was reached, that it was just
as essential to the validity of a private land claim, to
which a perfect title under the laws of Mexico was
asserted, that it should be presented and passed upon
by the tribunal organized by the political department
of the government for that purpose, as it was to a
claim relying upon an inchoate or equitable title; and
not only that, but it is declared that such a law is just,
reasonable, and constitutional, and not a violation of
the obligations of the treaty of Guadalupe Hidalgo.
Congress seems to have determined that all titles to
lands in the United States should rest upon American
titles, and that it was no violation of the treaty to
require them to be made such. In Louisiana and Flor-
ida, claims based upon inchoate and equitable titles
were to be made American titles under the act of 1824.
Legal titles were left to stand or fall on the merits of
their foreign titles. But our government was evidently
convinced that all lands claimed by virtue of foreign
titles should be passed upon by an American tribunal,
and, if the title was valid, or such as this government
was required to protect under the provisions of the
treaty of Guadalupe Hidalgo, and the laws of nations,
the decree of the American tribunal should give to
them an American title, and upon this theory the titles
to private land claims in California were adjudicated,
and the lands embraced in all such claims as were not
presented for settlement to that tribunal were declared
to be a part of the public domain, and the public land
laws were extended over them. Congress was doubtless
led to this conclusion also from considerations of pub-
lic policy, for until some action of this nature was

taken it would be impossible for the government to know what was or was not its own land, and subject to its land laws; but by such adjudication a record would be made of all valid claims; the public surveys would definitely fix their location; and in that way the government would have positive information as to what lands were subject to its disposal, and also that which belonged to private parties.

Passing, then, to the system adopted for the settlement of private land claims in New Mexico, which had become a part of the United States by the same treaty, it can not be well supposed that congress was less anxious to know, and have segregated from the public domain, lands held under foreign titles, which the government under the treaty was bound to respect, and have them settled and placed upon the land records and surveys of the country, and also become valid American titles, whose validity would be derived, after settlement, from the American sovereignty, and not from the foreign elements of title. In 1854 congress passed the first law which had for its object the settlement of private land claims in this territory. By this act of July 22, 1854, congress created the office of surveyor general, and conferred upon that officer power to ascertain the number, extent, and validity of all Spanish or Mexican grants of lands lying in this and other territories, made prior to cession, and to report thereon, "which report shall be laid before congress for such action thereon as may be deemed just and proper, with a view to confirm bona fide grants, and give full effect to the treaty of 1848 between the United States and Mexico." By this act congress asserted its right to do that which it authorized a board of commissioners and the courts to do in California, namely, examine and determine the validity of all land grants in New Mexico and other territories, making no exception of perfect titles. The very fact that it became necessary for con-

gress to require the surveyor general to report even the number of these claims, demonstrated the necessity of providing some tribunal having authority to ascertain the number, extent, and location of such claims, determine the validity of their titles, and place them upon the public records. Congress determined to do this, and simply required the surveyor general to furnish information, together with his opinion as to their validity, which would enable congress to act intelligently in determining the validity of these claims. Upon such reports many of these grant titles were settled by the confirmatory act of congress, and thereby obtained American titles. Congress finally ceased to act upon these reports, and on March 3, 1891, passed an act establishing a court of private land claims, and clothed it with authority to examine and settle claims of this nature. This court is given ample jurisdiction to settle all claims of this nature now unsettled, but it is provided that the holder of a perfect title "shall have the right (but shall not be bound) to apply to said court in the manner provided in this act for other cases for a confirmation of such title." There is also a provision that, if the claimant asserting a perfect title does not present his claim to the court, the United States may bring such claimant into court to try his title. Whether this provision was intended to exempt claimants relying upon a perfect title from presenting their claims for settlement, and as an indirect recognition of these claims, we are not called upon to decide.

So long as these claims are not adjudicated, the settlement of them belongs to the political department of the government, and not to the courts not specifically authorized to take cognizance of them. Congress has power to establish tribunals for the settlement of these titles, and doubtless has the power to confer such jurisdiction upon the territorial courts or those of the United States, but it has not by this act conferred

such jurisdiction upon the courts, except in the single instance where suit is brought by the United States against grant owners claiming a perfect title, and who refuse to avail themselves of the protection of the court established for the purpose of settling and confirming their titles, and by appeal. By the act of congress of June 21, 1860, Juan B. Vigil et al. were authorized to bring suit in the supreme court of this territory for lands which he, and those claiming under him, claimed, with the right of appeal to the supreme court of the United States. This shows that as early as 1860 congress regarded it as necessary that authority should be expressly granted before suit could be brought in the courts. In the case of Tameling v. United States Freehold and Emigration Co., 93 U. S. 644, the court says: "We have repeatedly held that individual rights of property in the territory acquired from Mexico by the United States were not affected by the change of sovereignty and jurisdiction. They were entitled to protection whether the party had the full and absolute ownership of land or merely an equitable interest therein, which required some further act of the government to vest in him a perfect title. The duty of providing the mode of securing them and fulfilling the obligations which the treaty of cession imposed was within the appropriate province of the political department of the government. * * * But congress legislated otherwise for the adjustment of land claims in New Mexico. By the eighth section of the act of 1854 (10 St., p. 308), the duty of ascertaining their origin, nature, character, and extent was expressly enjoined upon the surveyor general of that territory. He was empowered for that purpose to issue notices, summon witnesses, administer oaths, and perform all necessary acts in the premises. He was directed to make a full report with his decision as to the validity or invalidity of each claim, under the laws, usages, and customs of

the country before its cession to the United States. That report, according to a form to be prescribed by the secretary of the interior, was to be laid before congress for such action as might be determined just and proper. It will thus be seen that the modes for the determination of land claims of Spanish or Mexican origin were radically different. Where they embraced lands in California, a procedure essentially judicial in its character was provided, with the right of ultimate appeal by either the claimant or the United States to this court. No jurisdiction over such claims in New Mexico was conferred upon the courts, but the surveyor general, in the exercise of the authority with which he was invested, decides them in the first instance. The final action on each claim reserved to congress is, of course, conclusive, and therefore not subject to review in this or any other forum." In Pinkerton v. Ledoux, 129 U. S. 346, which was a case in which the Nolan grant of this territory was involved, the court says: "The surveyor general's report is no evidence of title or right of possession. His duties were prescribed by the act of July 22, 1854, before referred to, and consisted merely in making inquiries, and reporting to congress for its action. If congress confirmed a title reported favorably by him it became a valid title; if not, not. So with regard to the boundaries of a grant. Until his report was confirmed by congress it had no effect to establish such boundaries, or anything else subservient to the title. * * * There is a question which may be entitled to much consideration,—whether the Nolan title has any validity at all without confirmation by congress. The act of July 22, 1854, before referred to, seems to imply that this was necessary." In the case of Chaves v. Whitney et al., which was decided by this court at the January term in 1888; and which case involved the title to land grants in New Mexico, the court said: "Following the decision of the supreme court of the United States in the Tameling

case, in the very language used there, 'no jurisdiction over such claims in New Mexico was conferred upon the courts, but the surveyor general decides them in the first instance.' What the court meant by the use of this language we can not say. It is susceptible of two constructions. It may be that the court intended to declare that, as the law now stands, the whole power and jurisdiction over the subject of Spanish and Mexican land grants is committed into the hands of the surveyor general for investigation, with the reservation of the ultimate power to adopt or reject what he does by congress, and that, until after the confirmation or rejection of such grants through this mode of procedure, the courts have no jurisdiction whatever to hear and determine any question arising under such grants in this territory; or that congress, by the course of legislation adopted, has reserved to the political department the sole power of defining the rights of grant owners under the treaty, and to that end has withdrawn by implication all jurisdiction from the courts to interpret the treaty or define the legal rights of persons thereunder in the broad sense of general jurisdiction, involving necessarily the power and duty of the courts to construe the treaty, and define and enforce the rights of claimants as they might appear; but that, subject to the ultimate power reserved to congress, the courts would be permitted to exercise a limited jurisdiction to the extent of protecting the possession from intrusion by wrongdoers or persons having no superior title. We think the latter the more reasonable view to take, and especially so when it is provided by our local statutes that, in order to maintain ejectment, a strictly legal title need not be proven.'' Counsel for plaintiffs in error argue that the language used by the supreme court of the United States in the Tameling case, that ''no jurisdiction over such claims in New Mexico was conferred upon the courts,'' was mere dicta of the

court, and not necessary to the decision of the case, but that, if applicable to that case, it is not of general application, and that this court in adopting the language of the Tameling case as of general application, announced an erroneous doctrine. We can not so regard these cases, but, on the contrary, regard the decisions of the courts in these cases as the deliberate judgment of the court after mature consideration of the subject, and we regard the conclusions as correct, and affirm them in this case.

It is true that, as to grants to which a perfect title is asserted, the law of 1891 does not make the presentation of such claims to the court of private land claims compulsory, but there is no evidence obtainable from the provisions of the act creating that court that such Spanish or Mexican titles, prior to adjudication by that court, will be held valid as against the United States or a grantee under a patent from the United States, but, on the contrary, we think it clear that they will not be so held. Section 8, among other things, provided that "if in any such case, a title so claimed to be perfect shall be established and confirmed, such confirmation shall be for so much land only as such perfect title shall be found to cover, always excepting any part of such land that shall have been disposed of by the United States, and always subject to and not to affect any conflicting private interests, rights, or claims held or claimed adversely to any such claim or title, or adverse to the holder of any such claim or title." Section 14 provides "that if in any case it shall appear that the lands, or any part thereof, decreed to any claimant under the provisions of this act, shall have been sold or granted by the United States to any other person, such title from the United States to such other person shall remain valid, notwithstanding such decree." Here, then, we find a specific provision of law, enacted by the political department of the government,

that, where the government has sold or granted land embraced within a grant, it shall be held valid as against even a perfect Spanish or Mexican title, when the same is presented for confirmation by the court established for that purpose. That being the case, and the operation of the land laws not suspended, the reservation clause of the act of 1854 being specifically repealed, it is a provision of little value that a grantee having a perfect title "shall have the right (but shall not be bound)" to present the same for confirmation. When congress passed the act of 1851, providing for the settlement of private land claims in California, regardless of whether the title was perfect or inchoate, all grant owners were notified that the United States reserved the right to examine and determine the value of all foreign titles before such titles would be protected against alienation by the government; and as early as 1854 congress passed a law which, in effect, notified the grant owners that the political department of the government had opened the doors for the settlement of grant titles in New Mexico. The surveyor general was directed to report them to congress for confirmation. Many grant owners availed themselves of the benefits of the act, and as early as 1858 and 1860 confirmation of private land claims in New Mexico began. The penalty for a failure to present for settlement such claims, in California, within two years, was a forfeiture of the land to the United States, and Dominga Dominguez suffered the penalty by reason of a failure to present her claims to the court established for the protection of her rights under the treaty. In New Mexico there is no forfeiture declared for a failure to present a claim to the court of private land claims where a perfect title is relied on, but by the above provisions of the act of March 3, 1891, which established that court, grant claimants are advised that, so long as

they decline the protection of the tribunal established
for the settlement and protection of their treaty rights,
and prefer to rely upon a foreign title, all titles accru-
ing to settlers under the operation of the land laws of
the United States will be held valid as against any title
relied upon by them. Therefore there is a penalty to
which a claimant subjects himself who refuses to sub-
mit his title for confirmation to the court of private
land claims created by act of March 3, 1891. The title
of the defendant in error under the patent is by that
act expressly confirmed and declared superior to the
grant title set up in this case, and the penalty for delay
has been incurred by the grant owners. As counsel
for defendant in error suggests, congress never intended
that any claim under Spain or Mexico to grants of land
should be of higher dignity or effect without a decree
of confirmation than with such decree. It is clear that
if this claim had been presented to the court for con-
firmation, the title of defendant in error under the
patent would have been held valid as against the grant;
therefore it is idle to say that the grant title may
become superior to that of the patent by the grant
owners declining the jurisdiction of the court of pri-
vate land claims. To the contention that such a stat-
ute is in violation of the obligations of the treaty of
Guadalupe Hidalgo, it may be said that this court can
not consider that question. In the case of Botiller v.
Dominguez, 130 U. S. 238, the supreme court of the
United States decided that very question, saying:
"With regard to the first of these propositions it may
be said that, so far as the act of congress is in conflict
with the treaty with Mexico, that is a matter in which
the court is bound to follow the statutory enactments
of its own government. If the treaty was violated by
this general statute enacted for the purpose of ascer-
taining the validity of claims derived from the Mexican
government, it was a matter of international concern,

which the two states must determine by treaty, or by such other means as enables one state to enforce upon another the obligations a of treaty."

It follows from our conclusion as above announced that, inasmuch as the plaintiffs in error relied in the court below on their Spanish title papers, HOMESTEAD entry: final proof: evidence. executed prior to the year 1750, and, in effect, conceded that the Nicolas de Chavez grant, under which they claimed, was not confirmed by congress, or by any tribunal authorized by congress to examine into and determine the validity of such titles in New Mexico, the papers offered in evidence tending to establish such Spanish title were properly rejected by the court. The court, upon objection, properly rejected the evidence offered by plaintiffs in error relative to the presentation of such claims to the surveyor general of New Mexico in the year 1887, for the reason that, while the homestead patent was issued after that date, the homestead entry was made on the twenty-seventh day of December, 1882, and final proof was made thereon August 15, 1883. The patent was founded upon the entry and related back to the entry; the land, therefore, was segregated prior to the time the plaintiffs in error claim to have presented said claim to the surveyor general. Moreover, such presentation would not be of any value prior to confirmation.

Defendant in error relies upon a patent from the United States, which is the highest source of title in this country. After speaking of the value VALIDITY of patent: inadmissibility of collateral evidence to attack. of a patent from the United States as a source of title in an action of ejectment in the federal courts, the supreme court of the United States, in the case of Gibson v. Chouteau, 13 Wall. 92, says: "So, also, of an action of ejectment in the state courts, when the question presented is whether the plaintiff or defendant has the superior

legal title from the United States, the patent must prevail, for, as said in Bagnell v. Broderick, 13 Pet. 450, congress has the sole power to declare the dignity and effect of titles emanating from the United States; and the whole legislation of the federal government in reference to the public lands declares the patent the superior and conclusive evidence of legal title. Until its issuance, the fee is in the government, which, by the patent, passes to the grantee, and he is entitled to recover the possession in ejectment." "It is this unassailable character [of the patent] which gives to it its chief—indeed, its only—value as a means of quieting the possessor in the enjoyment of the land it embraces. If intruders upon them could compel him in every suit for possession to establish the validity of the action of the land department, and the correctness of its ruling upon matters submitted to it, instead of being a means of peace and security, would subject his rights to constant and ruinous litigation. He would recover one portion of his land if the jury were satisfied that the evidence produced justified the action of that department, and lose another portion, the title whereto rests upon the same facts, because another jury came to a different conclusion." Smelting Co. v. Kemp, 104 U. S. 641. "Until set aside or enjoined it must, of course, stand against a collateral attack with the efficacy attending judgments founded upon unimpeachable evidence. So with a patent for land of the United States, which is the result of the judgment upon the right of the patentee by that department of the government to which the alienation of the public lands is confided, the remedy of the aggrieved party must be sought by him in a court of equity, if he possesses such an equitable right to the premises as would give him the title if the patent was out of the way. If he occupy, with respect to the land, no such position as this, he can only apply to the officers of the

government to take measures in its name to vacate the patent or limit its operation. * * * In any event, whether the officers of the government have been misled by the testimony produced before them or not, the conclusions reached by them are not to be submitted for the consideration of every jury before which the patent may be offered in evidence. in the trial of an .action.'' Steel v. Smelting, etc., Co., 106 U. S. 447; Grant v. Jaramillo, 6 N. M. 313. The defendant in ·error, holding under the patent, had a superior right ·of possession, which the patent vested in her, and the patent, being valid upon its face, was not subject to a collateral attack such as was attempted by the plaintiffs in error in the court below in their tender of proof that the defendant in error, when she entered upon the possession of the patented lands embraced in her homestead, knew that said lands were claimed as a part of the Nicolas de Chavez grant. Consequently the court committed no error in excluding such evidence.

Plaintiffs in error assign as another ground of ·error that the court refused to allow them to prove JURISDICTION: that the lands embraced in the Nicolas de patent conclusive evidence of Chavez grant never belonged to the conveyance. United States, and upon this they contend that they were denied the right to show that the patent issued to defendant in error was void. We have practically disposed of this assignment, as the testimony which the plaintiffs in error contend would have shown that the United States never owned the land patented, and which the court excluded, is the same testimony offered by them to prove a perfect Spanish title. This assignment of error presupposes the plaintiffs in error to have had a perfect title to the land embraced in the grant that the court below was ·compelled to declare valid in this case; and, being prior in time to the patent, the land did not belong to

the United States when the patent issued, and that it was, therefore, a void conveyance. We have endeavored to show that the court below was powerless to take cognizance of the grant title, or declare it of any value whatever; and, the land being a part of the territory ceded to the United States, of which the court took notice, the patent was conclusive evidence in the court below of the proper conveyance of the land, and that the United States was the rightful owner at the time the patent issued.

The cases cited by counsel for plaintiffs in error in his brief to show that a patent is void when issued for lands that have been previously sold, reserved, or otherwise disposed of, or never belonged to the United States, while sound as applied to the facts of the cases in which the decisions were rendered, are not in point in this case. Patents were held void because the land had been previously sold, reserved, or otherwise disposed of by the United States itself, or some state or territory thereof, and not by a foreign government. For instance, in the case of Morton v. Nebraska, 21 Wall. 660, a patent was granted for agricultural lands, which proved to be saline lands. The court declared the patent void, for the reason that saline lands had always been reserved from sale as agricultural lands. In the case of Polk, Lessee, v. Wendell, 9 Cranch, there was a conflict between two grants of land by the state of North Carolina, and the prior grant was sustained and the junior declared void. And so in other cases. But the principle governing these cases is this: that the prior act of the sovereign in disposing of lands in the United States must govern; but this principle can not be applied to this case.

Counsel for plaintiffs in error, Mr. Clancy, suggests, but declines to argue, that the lands embraced in the homestead patent were reserved from sale by section 8 of the act of 1854, which created the office of

surveyor general of New Mexico, and required him to report all grants for confirmation, and then provided: "Which report shall be laid before congress for such action thereon as may be deemed just and proper with a view to confirm bona fide grants, and give full effect to the treaty of 1848 between the United States and Mexico; and, until the final action of congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the government, and shall not be subject to the donations granted by the previous provision of this act." By act of congress of May 24, 1858, the New Mexico land district was created, and the general land laws were extended to the lands of this territory, and, if this reservation took effect upon the taking effect of the law of 1854, the land would not be subject to entry in 1882, when the homestead entry was made. But we agree with the opinion of counsel for plaintiffs in error that the reservation took effect upon the coming in of the report of the surveyor general to congress, when its location and extent could be known and respected until final confirmation by congress, or under its authority; otherwise the greatest confusion would prevail, and the land laws would be practically inoperative. We are strengthened in this view by the construction given this clause by the commissioner of the general land office in his instructions to the surveyor general, dated October 10, 1884, and urging prompt examination and report upon a certain grant, in which he says: "Though the claim, if found valid, can not be definitely located till after confirmation, as a part of the inquiry you will endeavor to ascertain approximately, or as nearly as possible, the location and boundaries or limits of the same, and advise this office thereof, to the end that the land covered by the claim may be withheld or withdrawn from settlement or disposal pending final action thereon." Furthermore,

the homestead entry upon which the patent was issued under which the defendant in error claims, and which shows that the public land laws were operative, was allowed in 1882, or long after the passage of the act containing provisions for the reservation. If, therefore, the reservation took effect upon the report of the surveyor general, it has no application in this case, inasmuch as the surveyor general did not report upon the Nicolas de Chavez grant until December, 1887, or five years after the homestead entry was made, final proof made thereon, and final certificate issued. By the act of March 3, 1891, congress repealed section 8 of the act of July 22, 1854, which provided for the reservation of the land, and this of itself eliminates the question of the reservation of the land from this case.

There remains, then, for our consideration the fifth assignment of error, which is that the court erred IMPROVEMENTS: in excluding tendered proof of the value evidence. of the land in controversy, and the improvements made thereon by the plaintiffs in error. It is urged that under section 2581, Compiled Laws, New Mexico, plaintiffs in error have a right to recover the value of improvements made by them upon the land, and have a lien upon the land for the same. We think not. So far as this case is concerned, the land embraced in the homestead patent must be regarded as being part of the public domain at the time the homestead entry was made. There could be no rightful possession in plaintiffs in error, and the law was not intended to be available in behalf of a party wrongfully in possession; nor does this statute apply to this case for the further reason that such a lien would interfere with the disposition of the public lands of the United States. "The power of congress in the disposal of the public domain can not be interfered with or its exercise embarrassed by any state (or

territorial) legislature, nor can such legislation deprive the grantees of the possession and enjoyment of the property granted." Gibson v. Chouteau, 13 Wall. 92; King v. Thomas, 12 Pac. Rep. 865. The patent was introduced to sustain the issues for the plaintiff below, and, all of the testimony offered by the defendant having been excluded, the court properly instructed the jury to find for the plaintiff. We find no error in the record, and, therefore, affirm the judgment of the court below; and it is so ordered.

O'BRIEN, C. J., and SEEDS, J., concur; FREEMAN, J., being absent.