JOSEPH HUDNALL *et al. v.* O. M. D. HAM *et al.*

and

MARY E. T. TAYLOR *v.* JOSEPH HUDNALL *et al.*

*Opinion filed December 18, 1899—Rehearing denied February 17, 1900.*

1. CONTRACTS—*what will not invalidate ante-nuptial contract.* Mere ignorance by the parties to an ante-nuptial contract of the law that a marriage operates as a revocation of a prior will does not invalidate the contract or overturn the settlement thereunder, although one of the chief objects of the contract was to confirm a disposition of his property by the intended husband, in accordance with a will which he had previously made.

2. SAME—*execution of ante-nuptial contract does not prevent revocation of prior will by the marriage.* A marriage operates *per se* as a revocation of a prior will, notwithstanding an ante-nuptial contract was entered into for the purpose of expressly confirming the disposition of the property as made by the will.

3. ILLEGITIMATES—*right of inheritance depends upon statute.* The right of an illegitimate to inherit property and of legitimates to inherit from him is dependent upon the statute, and cannot exist in a case not within the provisions of the law.

4. SAME—*statute does not confer right of inheritance upon collaterals.* Clause 2 of section 2 of the Statute of Descent, (Rev. Stat. 1874, p. 418,) providing that the estate, real and personal, of an illegitimate person shall descend to and vest in the widow or surviving husband and children, confers no rights whatever upon collaterals.

5. SAME—*when half-brothers and sisters of illegimates cannot take under the statute.* Children of the mother of an illegitimate can claim under clause 4 of section 2 of the Statute of Descent only where there is no widow or surviving husband, and if there is a widow it is immaterial, so far as the right of such children to inherit is concerned, that she has estopped herself from asserting her right, as sole heir, under the statute.

6. ASSIGNMENT—*contingent interests may be assigned by a contract.* Contingent interests and expectancies, and things having no present existence but which rest only in possibility, may be assigned, so as to be binding in equity, by a contract made in good faith and for sufficient consideration.

7. SAME—*when ante-nuptial contract and revoked will operate as an equitable assignment.* An executed and binding ante-nuptial contract, made to confirm a previous disposition of the husband's property by will, together with the latter instrument, which was revoked, as a will, by the marriage, operates as an equitable assignment of the property in accordance with the terms of the contract and the

revoked will, where the contract was fairly entered into and expressly sanctioned by the wife, who subsequently became, under the statute, sole heir to her husband.

8. DOWER—*when question whether ante-nuptial contract would bar dower is immaterial.* Whether an ante-nuptial contract was sufficient to bar or release the widow's dower is not material, if the widow is sole heir under the statute and no question of homestead is involved.

MAGRUDER and PHILLIPS, JJ., and CARTWRIGHT, C. J., dissenting.

APPEAL from the Circuit Court of Jefferson county; the Hon. E. E. NEWLIN, Judge, presiding.

This is an appeal from a decree entered in the circuit court upon the final hearing of the issues made upon the bill filed by "the Hudnalls," as they are spoken of in the record, and upon the cross-bill of Mary E. T. Taylor, the widow of Jeremiah Taylor, deceased. The bill, in brief, alleged that Taylor was the son of Sallie Taylor and her then husband, Thomas Taylor, and that five years after his birth Sallie Taylor lawfully married one Hudnall, and that the complainants are the children, and descendants of deceased children, born of such marriage with Hudnall and are the only heirs-at-law of said Jeremiah Taylor, who died without issue; that in 1890 Taylor made a will, giving, except a few small legacies, all of his property to C. D. and O. M. D. Ham, sons of his first wife, and afterward, in 1892, married Mary E. T. Farmer, and died in 1895; that a few days before such marriage Taylor and Mrs. Farmer entered into an ante-nuptial contract, by which it was agreed between them that in lieu of dower, award, rights of inheritance and distribution she should, if she survived him, be paid, within sixty days after his death, $2000; that after Taylor's death and the probate of his will she was paid by the executor, and accepted and receipted for, said $2000, the amount due her under the contract, and in full of all claims against the estate, either under the will, or the agreement, or otherwise; that by her agreement and the full execution of its terms she renounced and relinquished all of her rights

and interests in and to said estate, as heir or otherwise; that by the marriage between her and Taylor the will which had been previously made was revoked, and Taylor's property descended as intestate estate to the complainants, who were his half brothers and sisters, and descendants of deceased half brothers and sisters, his said mother, Sallie Taylor, having previously died. The bill prayed that the probate of the will be set aside, that the will be declared void, and that a distribution of the estate among the complainants be made, and for general relief.

The Hams and the widow demurred to the bill. The demurrers were sustained and the bill dismissed, but on a writ of error sued out by the complainants the decree was reversed by this court and the cause remanded, with directions to overrule the demurrers and for further proceedings in conformity with the opinion rendered by this court. (*Hudnall* v. *Ham*, 172 Ill. 76.) When the case was re-docketed in the circuit court, "the Hams," as they are spoken of in the record, and other legatees and the executor, answered the bill, setting up the ante-nuptial agreement, and alleged that it was made in good faith and with full knowledge and for the purpose of confirming and approving the will; that it referred to and approved the will, and that by reason thereof the will was not revoked by the subsequent marriage, and alleged that the Hudnalls were not within the contemplation of either of the parties to the agreement, and that it could not operate in their favor. The answer denied that Taylor was of legitimate birth, but alleged that he was the illegitimate son of Sallie Taylor, a *feme sole*, and denied that the Hudnalls were his heirs. The answer also alleged that in 1848 Taylor, then without means, married Frances Ham, a widow and the mother of said C. D. and O. M. D. Ham, who were then of tender years; that said Frances had considerable property, and that said Taylor took possession of the same and of the property derived by

said O. M. D. and C. D. Ham from their father, and that
with this as a start he began to trade and was successful in business, so that he finally accumulated the property which he had at the time of making said will; that
there were no children of said marriage, but said Taylor
adopted the step-sons as his own, and that it was always understood by said Frances and said Jeremiah that
the said O. M. D. and C. D. Ham were to be treated and
regarded, in all respects, as the sons of said Jeremiah;
that they treated and regarded him as their father, and
labored for and assisted him, and obeyed him as though
they were his sons; that these facts were well known
to Mrs. Farmer when she entered into the ante-nuptial
agreement, which was made for the purpose of carrying
out Taylor's design; and the answer alleged that the
ante-nuptial agreement and will constituted an equitable
assignment to the Hams, and that in equity and good
conscience they were entitled to the property.

Mary E. T. Taylor, the widow, in her answer alleged
that when she signed the ante-nuptial agreement she was
not informed as to the extent of the property of said Taylor or as to his illegitimacy, which she had since learned;
that she understood he wished his property to go to the
children of his first wife, and was willing that such purpose should be accomplished, but alleged that she would
not have been so willing if she had known how much
property he had or that he was illegitimate, though she
admitted in her answer that when the ante-nuptial agreement was signed she had learned from him that he had
no living relatives; alleged, also, that when she executed
the agreement she was willing to release her future rights
in the estate to the descendants of his first wife, and believed that the will would have that effect, and that she
regarded the accomplishment of that purpose as an important part of the consideration to induce her to execute
the ante-nuptial agreement; that at the time she signed
the agreement, and also when she received the money,

she was in ignorance of her rights and of the extent and value of Taylor's property, which value was concealed from her, and that the $2000 was grossly inadequate and was disproportionate to the value of the estate; alleged, also, that the will was revoked by the marriage, and that one of the principal objects of the ante-nuptial agreement, and of her receiving and receipting for the $2000, has failed and cannot be accomplished, and that as the consideration has failed said agreement is not binding upon her, and offers to bring into court said $2000 and abide the order of the court. The widow filed her amended cross-bill also, in which she set up substantially the same facts, and prayed that the will and probate be declared void and set aside and the executor removed, and that the ante-nuptial agreement be also set aside and her receipt for said $2000 be declared to have no other effect than a receipt for so much money, and not a ratification of the agreement, and that an accounting be had.

BLOOD & BLOOD, SIMS & COVINGTON, and JAMES A. WATTS, for appellants Hudnall *et al.*:

We contend that the widow is bound by the ante-nuptial agreement and has no claim to the property. *Jacobs* v. *Jacobs,* 42 Iowa, 606.

Accepting and receipting for the $2000 was a ratification of the contract. *Taylor* v. *Taylor,* 144 Ill. 436.

There is a distinction between a contract of an executory character and an executed one. In the latter case there can be no rescission unless tainted by actual fraud. *Beebe* v. *Swartwout,* 3 Gilm. 162; *Hudnall* v. *Ham,* 172 Ill. 76.

So long as the transaction remains executory in its character, the burden is on the heir to show that the wife had full knowledge of the husband's property, and the courts will interfere in behalf of the wife, but after the contract becomes an executed one the courts will not interfere. *Brenner* v. *Gauch,* 85 Ill. 368; *Weaver* v. *Weaver,* 109 id. 225; *McMahill* v. *McMahill,* 113 id. 461.

All proper acts of an executor *de son tort* are binding if the rightful executor or administrator would have been bound to do likewise in due course of administration. *Hudnall* v. *Ham*, 172 Ill. 76; 7 Am. & Eng. Ency. of Law, 189; Williams on Executors, (7th Eng. ed.) 314.

The widow having elected to accept the money is bound by her election. A person cannot accept and reject the same instrument. Having availed of it as to part he cannot reject the remainder,—and this applies to deeds, wills, and all other instruments whatever. *Lilly* v. *Adams*, 108 Mass. 50; *Pickett* v. *Bank*, 52 Ark. 346; *Waters* v. *Howard*, 1 Md. Ch. 112; *Rodermend* v. *Clark*, 46 N. Y. 354; *Morris* v. *Rexford*, 18 id. 552; *Wilbanks* v. *Wilbanks*, 18 Ill. 19.

The effect of the ante-nuptial agreement was a positive exclusion of the marital rights of Mrs. Taylor, and upon the death of Taylor intestate, without issue, his next of kin are entitled to the estate. *Gamble* v. *Newman*, 5 Sneed, 466; *Loftus* v. *Penn*, 1 Swan, 445; *Crum* v. *Sawyer*, 132 Ill. 463.

A subsequent marriage revokes a prior will. Starr & Cur. Stat. chap. 39, sec. 10; *Crum* v. *Sawyer*, 132 Ill. 443; *Hudnall* v. *Ham*, 172 id. 76; *McAnnulty* v. *McAnnulty*, 120 id. 26.

Ignorance of the law in this respect will not change the rule. *Crum* v. *Sawyer*, 132 Ill. 443.

To enforce a will not as a will but as a contract would be to make a different disposition of the property of a deceased person than that provided by law. *Sloniger* v. *Sloniger*, 161 Ill. 278; *Woodward* v. *Woodward*, 5 Sneed, 51.

Expression of intention to make a gift will not amount to a contract nor sustain a decree for specific performance. *Galloway* v. *Garland*, 104 Ill. 277; *Clark* v. *Clark*, 122 id. 388; *Bailey* v. *Edmunds*, 64 id. 125.

We contend that as Jeremiah Taylor was of illegitimate birth and died without leaving a wife, (who can inherit,) mother, child or descendant of a child, his half-brothers and sisters and their descendants inherit his estate. Starr & Cur. Stat. (2d ed.) chap. 39, sec. 2, clause 4.

William H. Green, and C. S. Conger, (Green & Gilbert, of counsel,) for appellant Mary E. T. Taylor:

The ante-nuptial contract is not binding upon the complainant in the cross-bill, because, at the time of its execution, she was ignorant of the facts concerning Taylor's property and of the fact of his illegitimacy, and also because its terms are so unjust and manifestly inequitable. *Schouler on Husband and Wife*, sec. 360.

If the provision secured for the wife is manifestly unreasonable and disproportionate to the means of the intended husband it raises a presumption of intended concealment and throws upon him the burden of disproving the presumption. *Bierer's Appeal*, 92 Pa. St. 266.

Mrs. Taylor did not ratify or confirm the ante-nuptial contract by receiving the $2000 and executing her receipt therefor. To have that effect she must have elected to receive the money in lieu of asserting her rights as widow and heir, with full knowledge of the facts, and not in ignorance of any fact material to her interest, and not under a misapprehension of her legal rights. No act or series of acts performed by a party is deemed to ratify and confirm a previous contract, unless such act is done with full knowledge of all the material facts. *Railroad Co.* v. *Kelly*, 77 Ill. 426; *Wurster* v. *Reitzinger*, 5 Ill. App. 112.

Election can only be implied from plain and unequivocal acts, under a full knowledge of all the circumstances and of the rights of the parties. *Cauffman* v. *Cauffman*, 17 S. & R. 25; *Adair* v. *Brimmer*, 74 N. Y. 539; *Cumberland Coal Co.* v. *Sherman*, 20 Md. 30; *Spurlock* v. *Brown*, 91 Tenn. 243; *Lammot* v. *Bowley*, 6 H. & J. 526; Redfern on Wills, secs. 748-754.

The ante-nuptial contract cannot be regarded as an assignment of the estate of Taylor to the Hams, nor can it be used as an instrument or means of transferring such estate. A contract to make a will must be based upon sufficient and adequate consideration. *Whiton* v. *Whiton*, 179 Ill. 32; *Barrett* v. *Geisinger*, 179 id. 240.

An adequate consideration is one that is equal, proportionate, fully sufficient, complete; opposed to inadequate.  Anderson's Law Dic. 29.

GEORGE W. WALL, and C. H. PATTON, for appellees the Hams:

Section 2 of chapter 39 of the Revised Statutes provides that the estate, real and personal, of an illegitimate person shall descend to and vest in the widow or surviving husband and children, and if there are no children, then in the widow or surviving husband.  When there is no widow or surviving husband and no child or descendants of a child the estate shall vest in the mother and her children and their descendants, one-half to the mother and the other half to her children.  Here there was a widow, hence the complainants, who are the children and descendants of children of the mother, cannot inherit.

At common law an illegitimate had no inheritable blood.  He could not inherit or transmit.  The statute is in derogation of the rule at common law and must be strictly construed.  *Belanger* v. *Hersey,* 90 Ill. 70; *Jenkins* v. *Drane,* 121 id. 217; *Stoltz* v. *Doering,* 112 id. 234; *Bates* v. *Elder,* 118 id. 436; *Orthwein* v. *Thomas,* 127 id. 554; *Douglas* v. *Lewis,* 131 U. S. 75; *Cruse* v. *Aden,* 127 Ill. 232; *Williams* v. *Vanderbilt,* 145 id. 238.

It is not permissible to read into the statute an exception in case the surviving widow has been provided for by some other arrangement.  The statute makes no exception in the event the widow has assigned or waived or became barred of all interest in the estate, by contract or otherwise.  The fact that there is a widow effectually precludes inheritance through the mother.

The will and the ante-nuptial agreement in question in this case are one instrument, (*Bradish* v. *Gibbs,* 3 Johns. Ch. 523; *Bridges* v. *Duchess of Chandos,* 2 Ves. 217; 1 Jarman on Wills, 228; *Marlborough* v. *Godolphin,* 2 Ves. 78;) and constitute a contract which the parties had power to make

and which may be enforced at the instance of the bene-
ficiaries intended therein,—the legatees and devisees in
the will. Where no principle of public policy is violated,
parties are at liberty to forego any legal right, and may
therefore waive a provision of the statute or constitu-
tion which, if insisted upon, would inure to their benefit.
Sedgwick on Construction of Stat. & Const. Law, 87, 88;
*Tomb* v. *R. C. Co.* 18 Barb. 583; *Phyfe* v. *Esner*, 45 N. Y. 102;
*Morrison* v. *Underwood*, 5 Cush. 52; *Rumsey* v. *Railway Co.* 14
C. B. (N. S.) 649; *Shutte* v. *Thompson*, 15 Wall. 151.

It is competent for one to make an agreement for a
certain disposition of his property by will or otherwise;
and this may be enforced in equity, if upon valuable con-
sideration. Marriage is such a consideration. 2 Story's
Eq. Jur. sec. 1040 *b*, note 4; 1 id. sec. 354; 2 Blackstone's
Com. 297.

While the instrument which was once a will may be
deemed, by reason of its revocation by the marriage, to
be a will no longer, in the technical sense of the term,
yet it is not extinguished or obliterated, but is still in
force as a written instrument describing the property and
grantees thereof and showing the intent of the parties.
Hence, while not effective as a will it may be enforced as
a part of the contract which the parties intended to make,
and the doctrine of equitable estoppel will restrain an
assertion to the contrary. *Lant's Appeal*, 95 Pa. St. 279.

Mr. JUSTICE CARTER delivered the opinion of the court:

Upon the final hearing, where the greater part of the
testimony of the witnesses was heard in open court, the
chancellor rendered the decree appealed from, finding
the issues in favor of the Hams and dismissing both the
amended bill and the cross-bill. From this decree the
Hudnalls and the widow have taken separate appeals,
but these appeals have been considered together and
will be disposed of here as one case.

The cross-bill was not before us when the case was here on error, (172 Ill. 76,) and it was there said that the rights of the widow under her cross-bill were not affected by that decision, except that, as the bill alleged, the ante-nuptial contract having been fully performed by her acceptance of and receipt for the money under it, the burden rested upon her to show, if she could, any sufficient grounds upon which it could be set aside. We have carefully considered all of the evidence, and cannot avoid the conclusion, reached also by the court below, that she has not sustained this burden, but has failed to establish the allegations of her cross-bill that she was deceived by Jeremiah Taylor as to the extent and value of his property and as to the facts upon which her right to inherit his property would depend, or that the same were concealed from her. We cannot find, from the evidence, that the contract was not fairly entered into or not fairly carried out. It is clearly shown that she approved and joined in Taylor's desire that the bulk of his property should go to his said two step-sons, whom, as she knew, he had brought up from boyhood in his family with the same affectionate care as if they had been his own children, and who had aided him in the acquisition of his property. While it is doubtless true that she accepted and receipted for the $2000 in ignorance of the law that her marriage with Taylor revoked the will which he had made in favor of the Hams, still no deception was practiced upon her, and the Hams seemed to know no more of that subject than she, and evidently Taylor died in the belief that his property would pass in accordance with his will and the ante-nuptial contract. Such was the intention of both parties to this contract, shown both by the contract itself and the circumstances under which it was entered into. Her mere ignorance of the law can not be availed of by her to overturn the settlement.

Counsel for appellees make the contention, and cite authorities to support it, that the marriage was only a

presumptive revocation of the will, and that that presumption was in this case rebutted by the ante-nuptial agreement. But in effect the decision of this court when the case was here before on demurrer to the bill was, that the will was revoked by the subsequent marriage notwithstanding the ante-nuptial agreement. The question has been settled, at all events, by this court in *McAnnulty v. McAnnulty*, 120 Ill. 26, where it was held that under the provision of the statute that "a marriage shall be deemed a revocation of a prior will," a marriage operates *per se* as such revocation. It follows, therefore, that Taylor's will was revoked by his subsequent marriage, and that the devisees and legatees therein named cannot take the property under that instrument as a will. Nor can they take it at all unless the ante-nuptial agreement and the instrument executed as a will, when taken and construed together, constitute an equitable assignment of the property to them which a court of equity will enforce to carry the contract into affect in accordance with the intention of the parties to it. It follows, also, that the widow is barred by the ante-nuptial contract and its full performance unless the inheritance is cast upon her as the sole heir, for the reason that, as a matter of law, it can go nowhere else. Section 2 of chapter 39 of the Revised Statutes, in regard to descent, after providing that an illegitimate child shall inherit from its maternal ancestor, etc., provides: "Second, the estate, real and personal, of an illegitimate person, shall descend to and vest in the widow or surviving husband and children, as the estate of other persons in like cases; third, in case of the death of an illegitimate intestate leaving no child or descendant of a child, the whole estate, personal and real, shall descend to and absolutely vest in the widow or surviving husband; fourth, when there is no widow or surviving husband, and no child or descendants of a child, the estate of such person shall descend to and vest in the mother and her children, and their descendants—one-half to the

mother, and the other half to be equally divided between her children and their descendants, the descendants of a child taking the share of their deceased parent or ancestor; fifth, in case there is no heir as above provided, the estate of such person shall descend to and vest in the next of kin to the mother of such intestate, according to the rule of the civil law; sixth, when there are no heirs or kindred, the estate of such person shall escheat to the State, and not otherwise."

It is clear from the evidence that Taylor was the illegitimate son of Sallie Taylor, who by her subsequent marriage became the maternal ancestor of the appellants, the Hudnalls, and that if Taylor had left no widow they would have been his heirs-at-law, his mother, Sallie Taylor, having previously died and he never having had any child. The grounds, then, upon which the respective parties claim the property in controversy are reduced to these: The Hudnalls claim as Taylor's heirs-at-law under the statute; the Hams claim as equitable assignees under the ante-nuptial agreement, coupled with the instrument which, as a will, was revoked by Taylor's marriage; the widow claims that Taylor left no heir-at-law but herself, and that, being the sole heir, under the statute she is entitled to the property notwithstanding her agreement. The Hudnalls, by their bill, are the moving parties in the controversy, and their contention will be considered first.

At common law an illegitimate had no inheritable blood—could neither inherit nor transmit by inheritance save to those of his own body. The right of an illegitimate to inherit property, and the right of others, though legitimate, to inherit from him through the maternal line, are conferred by the statute and can have no existence in any case which does not come within the statute. The second paragraph, that "the estate, real and personal, of an illegitimate person, shall descend to and vest in the widow or surviving husband and children, as the estate

of other persons in like cases," has nothing to do with the case at bar, as mistakenly supposed by appellants, the Hudnalls. It confers no rights whatever upon collaterals. It simply gives to the surviving husband or wife and children of an illegitimate the same rights of inheritance from the deceased parent that they would have had if he or she had been legitimate. And by the third paragraph the widow, Mary E. T. Taylor, is made the sole heir of her deceased husband. Counsel for Hudnalls claim under the fourth paragraph of the statute. Had Mary E. T. Taylor died first, or had there been no widow, it is plain they could inherit under this clause, as they were children and descendants of deceased children of Sallie Taylor, the mother of Jeremiah Taylor. But the difficulty with their position is that the statute would make them heirs only in case Taylor left no widow, and he did leave a widow. It is immaterial whether the widow has assigned or has barred or estopped herself from taking or not, as their right to inherit does not, under the statute, depend on any act or contract of hers, but, so to speak, on her non-existence at Taylor's death. They cannot take under the statute and against the statute at the same time. They are not his heirs-at-law at all, because he left surviving him a widow. If we were at liberty to interpolate words in the statute and make it read, "When there is no widow who has not released or who is not barred or estopped by contract the estate shall descend," etc., the Hudnalls could be declared the heirs; but we have no authority to add to or qualify the statute or to pervert its plain meaning. Mary E. T. Taylor is no less the widow of Jeremiah Taylor because she executed the ante-nuptial agreement. She was his lawful wife and upon his death became his lawful widow, and her ante-nuptial contract cannot be used to confer heirship upon these appellants where none is conferred by law. Heirship is not created by contract, but by law only. Persons who inherit are heirs-at-law—not heirs by contract.

It is insisted by counsel for the Hudnalls that their contention is supported by *Crum* v. *Sawyer*, 132 Ill. 443,— that is, that the ante-nuptial agreement had the same effect to make them the heirs as would the death of the widow before the death of her husband. But in this they are in error. What was there said was in reference to the ante-nuptial contract on the rights of the surviving husband and other heirs where there were other heirs-at-law of the wife, he being only one of such heirs. It was not held or intimated that the effect of the contract was to make persons heirs-at-law who were not so by law, but only to enlarge the portions which the other heirs would take. And such, of course, would be the necessary effect, for the release of one heir to the estate would operate to increase the shares of the rest without at all changing the legal status of heirship.

Again, it is difficult to see upon what principle of equity a court of equity could proceed to grant the relief prayed for. To give the ante-nuptial agreement the effect contended for would violate equities of the strongest character, and would be to enforce only a part of the contract,—just enough of it to dispose of the widow out of the way of the other appellants, and then, ignoring the rest of it, to violate the clearly expressed intention of the contracting parties by disposing of the property in utter disregard of the sole purpose for which the contract was made. It is to be noted that the Hudnalls rely upon this contract, for without it they concede that the widow would be the sole heir and they would have no rights, as heirs or otherwise. The contract, however, shows on its face that it was not made for their benefit but for the benefit of others,—that is, to dispose of the property at Taylor's death to the persons as named in his will. The Hudnalls assume the same position toward the contract as toward the statute,—that is, while claiming by virtue of it they at the same time claim against its provisions. This they cannot be permitted to do. They cannot avail

themselves of so much of the contract as is favorable to them and disregard or override that which is against them. The contract should be enforced altogether, if at all, and not partially, (2 Story's Eq. Jur. 986, 1077, and notes,) and so as to carry into effect the intention of the contracting parties, and not to thwart that intention.

It clearly appearing, then, that the Hudnalls are not entitled to the property, the question remains whether the widow, as sole heir of her deceased husband, is entitled to it, or whether there was an equitable assignment of it to the Hams. It is plain that it did not escheat, for the sixth paragraph of the statute provides, that "when there are no heirs or kindred, the estate of such person shall escheat to the State, and not otherwise." Clearly, then, unless the ante-nuptial contract, in connection with the instrument revoked, as a will, by operation of law, constitutes an equitable assignment to the Hams,—the persons named as beneficiaries in the so-called will,—the widow is entitled to the property as the sole heir, for if the contract does not have this effect it cannot, under the facts in this case, have any effect whatever. As a mere release or relinquishment for the benefit of the heirs of the deceased, there being no heir but herself, the instrument could have no more effect than one made for her own benefit. But we are of the opinion that the contract has all the effect of an equitable assignment of all her interest in the property to the intended beneficiaries, as expressed in the instrument executed by Taylor for his last will. It is too well settled to require discussion that contingent interests and expectancies, and things having no present existence but which rest only in possibility, may, by contract *bona fide* made and for a sufficient consideration, be assigned so as to be binding in equity. Such a contract will be enforced in equity after the subject matter of it has come into existence. (*Crum* v. *Sawyer*, 132 Ill. 443; 2 Am. & Eng. Ency. of Law,—2d ed.— 1029, and notes.) Thus it was said by this court in *Crum*

v. *Sawyer:* "This court has repeatedly held that estates in expectancy, though contingent, are proper subjects of contract, and, therefore, that assignments by expectant heirs of their future contingent estates, when made fairly and upon valuable considerations, though inoperative at law, will be enforced in equity as executory agreements to convey." (132 Ill. p. 461; *Ridgeway* v. *Underwood,* 67 id. 419.) It is also well settled that it is competent for persons owning property or interests therein to make a contract to dispose of it, by will or otherwise, in a certain way, and that such a contract, based upon a sufficient consideration, will be enforced in equity. (*Whiton* v. *Whiton,* 179 Ill. 32; *Barrett* v. *Geisinger,* id. 240.) It is also true that several instruments may be taken and construed together as constituting one entire contract. *Freer* v. *Lake,* 115 Ill. 662; *Wilson* v. *Roots,* 119 id. 379.

Taylor had been appointed the legal guardian of his step-sons when they were infants and had received certain moneys belonging to them, and there was no record or other evidence whether or not he had ever accounted for or paid the same, but the evidence is undisputed that he stood *in loco parentis* to them from his marriage to their mother, and after they grew to manhood still regarded them as his sons, and until his death cherished the life-long purpose of making them the beneficiaries of all of his property. To accomplish this purpose he made the will in question, and the contract with his second wife before his marriage. The record shows that she was fully informed of substantially all of these facts and was willing to assist him in carrying out his long-cherished purpose. Under these circumstances the ante-nuptial agreement was made, which, in addition to the usual provisions of release and relinquishment in such instruments, contained this provision: "Said party of the second part hereby declares that she has been informed of the execution of a will by the party of the first part, by the terms of which his entire estate, whether in posses-

sion or expectancy, has been devised and bequeathed to persons other than herself; and she further declares that such disposition of the property of the first party meets with her approval, and will not be interfered with by her in any way, either during the lifetime of the party of the first part or thereafter." It appears, also, that the will in question was the will referred to, and that after Taylor's death and the probate of the will she received from O. M. D. Ham, the executor, the $2000, and gave her receipt for the same, which receipt stated, among other things, that it was given for "the amount due me by the terms of the ante-nuptial agreement between the undersigned and said Jeremiah Taylor, deceased, and in full of all claims against said estate, either under said last will and testament or said ante-nuptial agreement, or otherwise." The receipt also recited that she had received certain other articles of personal property which had been given to her by Taylor in his lifetime.

It seems too clear for argument upon the facts and circumstances under which the will and ante-nuptial agreement were made, and from the reference to the will in the agreement and her covenant not to interfere with its provisions, that the written instrument intended as a will became a part of the whole agreement between the parties, notwithstanding the operation of the statute revoking the instrument as a will. It was still an intelligible written declaration of Taylor's wishes and intentions that the property should go to the Hams at his death, and though inoperative as a will, the written contract signed by him, and by the widow, who was his sole heir, made it operative as a part of their contract. Her contract of approval was a contract of confirmation, and her covenant not to interfere in any way with the disposition of the property thus made is binding upon her, especially in view of her ratification and full performance of the contract after Taylor's death. Construing the instrument intended as a will and the ante-nuptial

agreement as one entire contract, its effect was a bind-
ing agreement between the only two parties having any
interest in the property, either in possession or expect-
ancy, that upon Taylor's death the whole title of the
property should vest in the Hams, as provided in the
instrument called a will.

While no case precisely in point has been cited by
counsel on either side, we are referred to many cases
which announced and applied equitable principles to
carry out the intention of the parties, which are equally
applicable here.    Thus, in *Lant's Appeal*, 95 Pa. St. 279,
on the eve of marriage the man and woman agreed ver-
bally that she should dispose of her property, which was
of large value, as she pleased, whereupon she made a will
giving a liberal portion to her intended husband and the
rest to relatives and charities, and thereupon they were
married.    Two years thereafter she died.    The husband
contested the will and claimed the entire estate, but it
was held that while the will was revoked, under the stat-
ute, by the marriage, it would, in connection with the ver-
bal agreement, be enforced in equity as an ante-nuptial
contract, and that the husband was estopped from inter-
fering with its full enforcement.    See, also, *Bradish* v.
*Gibbs*, 4 Johns. Ch. 532; 1 Ld. Raym. 290; 2 P. Wms. 209;
also *Neves* v. *Scott*, 9 How. 196, (13 How. 268,) where an
ante-nuptial agreement was enforced which provided that
the property of each of the contracting parties should be
held in common after their marriage during their joint
lives, and by the survivor during his or her life, and then
should be equally divided among the heirs of the man on
the one hand and of the woman on the other.    There were
no direct heirs, and evidently none were contemplated
by the contracting parties, and it was held that their
collateral heirs could enforce the contract; that they
were not volunteers, but came fairly within the influence
of the considerations upon which the agreement of the
parties was founded, and were the special objects of their

bounty. It was said by the court in that case that "courts will endeavor, as much as possible, to give effect to marriage agreements according to the understanding of the parties." There would seem to be no serious difficulty in the case at bar in carrying into effect the marriage settlement under consideration.

Nor do we regard the suggestion of counsel, even if it be correct, that Taylor was not deprived, by the ante-nuptial agreement, of the power to change his will, but that it remained ambulatory till his death and might have been changed altogether, as fatal to the contentions of the Hams. As a matter of fact, he did not modify or change it. The ante-nuptial agreement would not have been invalid if it had in express terms reserved to Taylor the power to make a different disposition of his property freed from all claims of the widow.

It is further suggested that the contract was not sufficient to bar or release the widow's dower. She was the sole heir and there was no separate dower interest, and no question of homestead is involved in the case.

It is next said that as the Hams filed no cross-bill they can have no relief. It is sufficient to say that the decree appealed from granted them no affirmative relief, but simply found the issues in their favor and dismissed the bill of the Hudnalls and the cross-bill of the widow, which attacked their right to and possession of the property. The Hudnalls had no right to it whatever, and the widow had disposed of her right to it by contract, and had estopped herself from interfering in any way with the Hams in the assertion of their claims.

The decree is right from every standpoint, and it will be affirmed.                    *Decree affirmed.*

PHILLIPS and MAGRUDER, JJ., and CARTWRIGHT, C. J., dissenting.