In the Matter of the Estate of EUGENE GRIFFITH, Deceased.

Surrogate's Court, Monroe County, January 20, 1938.

*William A. De Graff* [*H. L. Steel* of counsel], for the proponent.

*Leo D. Mahoney,* for the widow.

FEELY, S. The first question here is whether the widow of this testator has lost, by reason of a separation agreement, her standing as a " person interested " (Surr. Ct. Act, § 314, subd. 10), which is prerequisite in order for her to raise the further question whether her deceased husband had canceled his last will that has since been propounded as such in this proceeding.

The separation agreement was made in 1914 — a year before the will — and it recites that " the duration of this agreement shall be for the joint lives of the respective parties." It omits to bind also the heirs and legal representatives of the parties. No specific reference is made therein to dower nor to rights of inheritance in the estate of either, nor to a last will of either; nor to the statutory rights of quarantine or exemption; nor to any other post-mortuary rights of either party, directly or indirectly. On the trial stress was laid on that portion of the agreement whereby the wife agrees to accept the monthly payments " in lieu of all claims or rights to support arising out of the marriage."

The pertinent general principles are readily deducible from the variety of forms in which such separation agreements are found to have been expressed. These agreements have little, if any, effect on the marital relation of the couple more than would a judgment of separation in an action between them. They do not amount to a divorce *a vinculo,* and the marriage remains in full force and effect, with the given minor modifications of the rights of alimony or consortium. For those reasons it has been held that " the agreement * * * cannot be regarded as a waiver of any of their legal rights beyond the express terms thereof." (*Jardine* v. *O'Hare,* 66 Misc. 33.)

This rule has been approved, in effect, by our Court of Appeals (*Matter of Burridge,* 261 N. Y. 225, 229), where it cites *Girard* v. *Girard* (29 N. M. 189; 221 P. 801). The official syllabus of the decision last cited states:

" In the construction of contracts, where it is sought to deprive either husband or wife of property rights growing out of the marital

relation, courts will go no further than the language of the contract extends, and will not deprive either spouse of such rights unless there is a clear and unmistakable intention to barter them away.

" Where a separation contract between husband and wife does not, by express terms or necessary implication, provide that she waives, releases, relinquishes, and renounces her right to inherit from him upon his death, intestate and without issue, such right still remains with and may be enforced by such surviving widow."

In this *Girard* case the widow had released any rights she had in any property her husband had or should acquire " during his natural life." The court remarked: " No mention is made of the husband's ' heirs,' ' executors ' or others in that class. The terms ' inheritance,' or ' right of inheritance ' are entirely absent."

That court also cited *Jardine* v. *O'Hare (supra)*, where it was said: " while he agrees not to make any claim of any kind against her and releases her from any and all claims whatsoever, there is no release of any claims or rights which the law gives him in her estate upon her death."

No waiver was also held to result where an ante-nuptial contract released all rights of the parties that " might rest in them under the law by reason of their expected marriage." (*Beard* v. *Beard*, 22 W. Va. 130.)

So, the failure of the contract to define the term during which the payments were to be made influenced the conclusion that the parties intended the payments should be made only during the life of the husband. (*Matter of Junge*, 125 Misc. 707.)

In *Matter of Gilmour* (146 Misc. 113), although the agreement did not state the wife released the husband's estate, the parties' own interpretation of it, by their conduct, divorce and remarriage on the part of each, implied they understood each was giving up all claims upon the other or their respective estates.

The instances where there was an " express " waiver or a " clear and unmistakable intention " to waive may be helpful by way of contrast. An extension of the agreement to heirs and personal representatives is found in *Matter of Burridge* (261 N. Y. 225) and in *Matter of Klein* (121 Misc. 568) and in *Matter of Hagen* (119 id. 770).

" While it is true that the presumption is that personal representatives of a decedent shall, upon his death, be bound by the latter's contracts (*Barnes* v. *Klug*, 129 App. Div. 192; *Kernochan* v. *Murray*, 111 N. Y. 306), this does not mean that they necessarily became responsible for payments after his death. Their liability is only that of the decedent, and if the liability for payments terminated upon his death, then his personal representatives also have no further liability." (*Matter of Junge*, 125 Misc. 707.)

Reference to the husband's last will as a source of support or bounty appears in *Matter of Young* v. *Hicks* (92 N. Y. 235). In *Matter of Tierney* (148 Misc. 378, 386) the husband was given the right to dispose of his property by will as if he were unmarried; and rights of inheritance were also mentioned in *Matter of Loeb* (155 Misc. 863) and in *Hudnall* v. *Ham* (183 Ill. 486; 56 N. E. 172) and in *Matter of Edelman* (148 Cal. 233; 82 P. 962).

In the *Klein* case (*supra*) the separation agreement is described as a " permanent settlement;" dower was specifically released; heirs and representatives were bound. In the *Hagen* case, besides binding heirs, etc., reference was made to a release of any property the husband might thereafter acquire by devise or gift, and the wife covenanted that he might " absolutely dispose of the same as if he were unmarried." So, in *Matter of Wylie* (187 App. Div. 840), although reference to heirs and representatives is omitted, a broad release is followed with the declaration that " the purpose and intent of this agreement is to place these parties in the same relation and position as if no marriage had been solemnized between them — so far as any and all obligations are concerned."

In *Matter of Brown* (153 Misc. 282) the late Surrogate SLATER appears to have found the decisive point in the fact that the joint lives of the couple were fixed as the period in which the husband would pay for the wife's support. She released all her dower or rights of dower in any land the husband then had or should thereafter acquire " as if the marriage had never been consummated." Although this agreement did bind the heirs and representatives, the court held it related only to dower, without saying whether inchoate or consummate dower was meant; and also held that the widow could have both her exempted property and her intestate share because the contract did not expressly show the wife was releasing any interest except dower. He wrote: " Not a word is expressed to show that these obligations were intended to affect her right by reason of her marriage in the event of his death. Inference or implication is not sufficient to effect the release of property rights. A construction of contracts of this character demands more definite terms than are found in this agreement to divest the wife of her rights under the law." In citing *Jardine* v. *O'Hare* to support this ruling, the surrogate classified the *Brown* case as outside the group of those wherein " the contract contemplates and provides for that situation after the husband's death." (*Matter of Burridge, supra.*)

In *Rouse* v. *Rouse* (76 Kan. 311; 91 P. 45) and in *Magee* v. *Magee* (67 Barb. 487) the agreement was to support the widow during her natural life, " or so long as she remains the widow " of the

decedent; and in *Barnes* v. *Klug* (129 App. Div. 192) the agreement was to support the wife during her lifetime, although the husband's personal representatives were not mentioned. A like contract appears in *Matter of Golding* (127 Misc. 821), except that any excess of annual income over $500 was to be paid back to the husband, or his personal or legal representatives, and a power of sale was available after his death. In *Matter of Davis* (106 Cal. 453; 39 P. 756, said in the *Girard* case to be " against the weight of authority ") the widow relinquished forever all claims " she may now or hereafter have * * * or may hereafter in any manner acquire." One of the judges in this *Davis* case noted that the appeal had been argued on the theory that she had relinquished all her rights as an " heir." A similar agreement is found in *Wallace* v. *Bassett* (41 Barb. 92).

In the light of these illustrations there does not seem to be any clear, express and unmistakable waiver of the widow's rights in this husband's estate after his death in the provision of the contract now in hand wherein she merely waived " all claims or rights to support arising out of the marriage." This must be read in connection with the other provision that the duration of this agreement was to be for the " joint lives " of the respective parties. This coincides with the rule that alimony is ended by death. Every post-mortuary feature of the foregoing cases is absent in this separation agreement. It did not deprive the widow of a legal standing to contest this will.

The next question here presented is whether this testator's last will was so canceled as not to be entitled to probate. The various physical ways in which a last will can be legally changed, without resort to another will, or the equivalent of a codicil, for the purpose, are limited by the peculiar wording of our statute to the will itself as a whole, and do not include the revocation of a part of the will, such as a clause or a paragraph by itself. It is true a mutilation of the subscription signature would be a change of a part, literally speaking, but of the one part that is customarily regarded as the symbolic embodiment of the whole will.

The obliteration, beyond recovery, of a legatee's name, or of the amount of his legacy, has been held not to be a revocation either of that particular part, or of the whole will; and that the will is entitled to probate in its irrecoverably mutilated form. In that particular case, at least, there seems to be a break in the prevailing theory that partial revocation is illegal, because the mutilated will, or rather, the " remains " of the will, so admitted to probate, is not the will testator intended when he duly signed it in its first unaltered form. However, the rule against partial revocation has long been established.

Can the facts of the case now in hand be interpreted as constituting a case of revocation of a part of this will, or of the will as a whole? This testator in 1915, twenty years before his death, wrote out this last will in his own handwriting, on a stationer's blank form. It contains only one dispositive clause, which is the omnibus " First," wherein he provided for the disposition of all his estate, after the payment of his just debts, to his mother if she survived him, or to his sister Olive to the extent of $5,000, and the rest to his nephews and nieces; and he named his brother-in-law testamentary guardian. This omnibus " First " paragraph ends with exempting the guardian from binding himself as such; and then " Lastly " an executor is named in the part of the printed form which concludes with revocation of all other wills.

Running diagonally through most of this omnibus " First " paragraph from the point where the guardian is nominated, and continuing on up to the first line of this paragraph, is the word " void," handwritten, in free-hand, in ink, in large letters about an inch high and four inches long. This indorsement is in form a cancellation, properly so called; and in its nature and extent one that might possibly have been intended to cancel the whole will, because it cuts diagonally through 'each and every dispositive line in that paragraph, save only the first one as to the payment of debts, and the last one as to exemption from bond. The clause nominating the executor and the three signatures also are intact. There is no indication, as the will now appears, on its face alone, that this cancellation was intended to revoke any one legacy in particular of the three alternative or successive legacies in said paragraph contained, going to five persons in certain events therein specified. No other change appears anywhere else on this paper. At the time of the cancellation, the testator's mother had died; and the other legatees named, aside from his wife, were his nearest relatives. The inquiry is thus limited to ascertaining who wrote in this word " void," and with what intention.

The burden of proof is said to be on the party asserting revocation. (*Matter of Parsons*, 119 Misc. 26; affd., 236 N. Y. 580.) In his favor is the presumption that when a will, thus canceled, is found in testator's possession at his death, he himself was the one who made the change, with the intention of revoking the will. This, with proof that the words of cancellation were written by him, would together make out a case of revocation of the whole will, by a legal cancellation within the meaning of our statute (Dec. Est. Law, § 34).

In the reported cases where the word " void," or its equivalent, " revoked," appears placed as it does here, testators generally

have added not only their signature or initials, but also the word "will," which indicates the whole instrument was intended. Here in addition to the solitary word "void," in testator's handwriting, there is proof of his contemporaneous declaration, forming part of the act itself or *res gestœ* that he wrote this word there to change his will in so far as his sister Olive was concerned. The proponent, therefore, claims the testator's true intention was much less extensive than the physical change he made on the face of the will might superficially indicate. In the summer of 1935, Bessie Florack, testator's nurse and attendant, saw the testator write that word "void" across the will, after he had talked on the telephone with some man. The witness told him to wait and call up his sister, Olive; and that after testator had phoned Olive, he immediately proceeded to write the word "void" on the will; and that testator at the same time said "as far as Olive and me are concerned, that ends Olive and me," and "that ends Olive and me as far as this is concerned." At this time testator was angry and in no condition to be brought back up stairs. He was much under the influence of liquor, and was trembling, when he phoned with the man, and with his sister. To his sister something was said by him about her having gotten all of their mother's furniture. The liquor he had taken probably did not render him incapable of appreciating the nature and consequences of his actions on this occasion when he wrote "void" across the will.

Testator had a wife and had said that she would never get anything so far as he was concerned. He was informed about the time by an attorney of the change in 1930 in the statute in favor of a surviving spouse, and was determined his wife should never get any of his money, except the draft he sent her monthly under the separation agreement. He was also told that he could not change his will after 1930 without thereby letting his wife in for a share of his estate. Before the word "void" was written across the will he told a representative from the bank that he had no desire to change his will. After the word "void" had been written testator retained the will in his possession until his death, when it was found in his safe deposit box, and he remained on friendly terms with some of the nephews and nieces mentioned therein, and had spoken of the will with them. They are Olive's children.

From those undisputed facts the somewhat more probable inference can fairly be drawn that testator, by the word "void" meant to cancel only the $5,000 bequest to his sister Olive, but, owing both to his lack of legal training and also to his emotional and intoxicated state at the time, instead of calmly and carefully drawing lines

through Olive's name only and her $5,000 and writing " void " on or near them, with his name or initials, he naturally overdid the thing, and " slopped over," as the vulgar expression runs, and thus inadvertently spread out the physical cancellation so far and wide of his mark as to involve, apparently and presumptively, the whole will itself, were it not for the fact that reliable evidence remains to show that testator's actual intention in so doing was only to eliminate his sister Olive alone. In other words, it satisfactorily appears now that testator actually meant to cancel and revoke only one part of his will, but he went about it in a manner that the law does not permit nor sanction. His writing of the word " void " was, in the circumstances here, ineffectual in law to revoke either the $5,000 legacy to his sister Olive or to revoke the will as a whole. The will having been made before 1930, and so as to dispose of his entire estate, his widow now has no rights in or to his estate. There is no evidence in this case to support the objector's other allegations as to mental incapacity, undue influence, etc. The propounded instrument, therefore, should be admitted to probate just as it was originally written, disregarding the word " void " later written thereon.

On notice or appearance of counsel submit for signature and entry a decree in accord with this decision.